related cases was calculated as the average annual number of such cases reported to CDC from 1983 to 1992, the most recent years for which published outbreak data are available. For pathogens also under passive surveillance, we used the average number of cases reported to CDC from 1992 through 1997, and for pathogens under active surveillance through FoodNet, we used the average rate observed for the surveillance population from 1996 to 1997 and applied this to the total 1997 U.S. population (with some modification for *E. coli* O157:H7; Appendix).

**Table 2. Reported and estimated[a] illnesses, frequency of foodborne transmission, and hospitalization and case-fatality rates for known foodborne pathogens, United States**

| Disease or Agent | Estimated total cases | Reported Cases by Surveillance Type | | | % Foodborne transmission | Hospital-ization rate | Case-fatality rate |
| | | Active | Passive | Outbreak | | | |
|---|---|---|---|---|---|---|---|
| **Bacterial** | | | | | | | |
| *Bacillus cereus* | 27,360 | | 720 | 72 | 100 | 0.006 | 0.0000 |
| Botulism, foodborne | 58 | | 29 | | 100 | 0.800 | 0.0769 |
| *Brucella* spp. | 1,554 | | 111 | | 50 | 0.550 | 0.0500 |
| *Campylobacter* spp | 2,453,926 | 64,577 | 37,496 | 146 | 80 | 0.102 | 0.0010 |
| *Clostridium perfringens* | 248,520 | | 6,540 | 654 | 100 | 0 003 | 0.0005 |
| *Escherichia coli* O157:H7 | 73,480 | 3,674 | 2,725 | 500 | 85 | 0.295 | 0.0083 |
| *E. coli*, non-O157 STEC | 36,740 | 1,837 | | | 85 | 0 295 | 0.0083 |
| *E. coli*, enterotoxigenic | 79,420 | | 2,090 | 209 | 70 | 0.005 | 0.0001 |
| *E. coli*, other diarrheogenic | 79,420 | | 2,090 | | 30 | 0.005 | 0.0001 |
| *Listeria monocytogenes* | 2,518 | 1,259 | 373 | | 99 | 0.922 | 0.2000 |
| *Salmonella* Typhi[b] | 824 | | 412 | | 80 | 0.750 | 0.0040 |
| *Salmonella*, | 1,412,498 | 37,171 | 37,842 | 3,640 | 95 | 0.221 | 0.0078 |

007731

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| nontyphoidal | | | | | | | |
| Shigella spp. | 448,240 | 22,412 | 17,324 | 1,476 | 20 | 0.139 | 0.0016 |
| Staphylococcus food poisoning | 185,060 | | 4,870 | 487 | 100 | 0.180 | 0.0002 |
| Streptococcus, foodborne | 50,920 | | 1,340 | 134 | 100 | 0.133 | 0.0000 |
| Vibrio cholerae, toxigenic | 54 | | 27 | | 90 | 0.340 | 0.0060 |
| V. vulnificus | 94 | | 47 | | 50 | 0.910 | 0.3900 |
| Vibrio, other | 7,880 | 393 | 112 | | 65 | 0.126 | 0.0250 |
| Yersinia enterocolitica | 96,368 | 2,536 | | | 90 | 0.242 | 0.0005 |
| Subtotal | 5,204,934 | | | | | | |
| | | | | | | | |
| **Parasitic** | | | | | | | |
| Cryptosporidium parvum | 300,000 | 6,630 | 2,788 | | 10 | 0.150 | 0.005 |
| Cyclospora cayetanensis | 16,264 | 428 | 98 | | 90 | 0.020 | 0.0005 |
| Giardia lamblia | 2,000,000 | 107,000 | 22,907 | | 10 | n/a | n/a |
| Toxoplasma gondii | 225,000 | | 15,000 | | 50 | n/a | n/a |
| Trichinella spiralis | 52 | | 26 | | 100 | 0.081 | 0.003 |
| Subtotal | 2,541,316 | | | | | | |
| | | | | | | | |
| **Viral** | | | | | | | |
| Norwalk-like viruses | 23,000,000 | | | | 40 | n/a | n/a |
| Rotavirus | 3,900,000 | | | | 1 | n/a | n/a |
| Astrovirus | 3,900,000 | | | | 1 | n/a | n/a |
| Hepatitis A | 83,391 | | 27,797 | | 5 | 0.130 | 0.0030 |
| Subtotal | 30,883,391 | | | | | | |
| Grand Total | 38,629,641 | | | | | | |

[a] Numbers in italics are estimates; others are measured.

[b] >70% of cases acquired abroad.

Irrespective of the surveillance system, many cases of foodborne illness are not reported because the ill person does not seek medical care, the health-care provider does not obtain a specimen for diagnosis, the laboratory does not perform the necessary diagnostic test, or the illness or laboratory findings are not communicated to public health officials. Therefore, to calculate the total number of illnesses caused by each pathogen, it is necessary to account for underreporting, i.e., the difference between the number of reported cases and the number of cases that actually occur in the community. For *Salmonella,* a pathogen that typically causes nonbloody diarrhea, the degree of underreporting has been estimated at ~38 fold (Voetsch, manuscript in preparation) (21). For *E. coli* O157:H7, a pathogen that typically causes bloody diarrhea, the degree of underreporting has been estimated at ~20 fold (22). Because similar information is not available for most other pathogens, we used a factor of 38 for pathogens that cause primarily nonbloody diarrhea (e.g., *Salmonella, Campylobacter*) and 20 for pathogens that cause bloody diarrhea (e.g., *E. coli* O157:H7, *Shigella*). For pathogens that typically cause severe illness (i.e., *Clostridium botulinum, Listeria monocytogenes*), we arbitrarily used a far lower multiplier of 2, on the assumption that most cases come to medical attention. Details of the calculations for each specific pathogen and rationale are provided in the Appendix. Where information from both active and passive reporting was available, we used the figure from active surveillance when estimating the total number of cases.

007732

Having estimated the number of cases caused by each pathogen, the final step was to estimate for each the percentage of illness attributable to foodborne transmission. The total number of cases was then multiplied by this percentage to derive the total number of illnesses attributable to foodborne transmission. The rationale for each estimate is presented in the Appendix; although precise percentages are generally difficult to justify, in most instances there is ample support for the approximate value used.

Results are presented in Tables 2 and 3. Known pathogens account for an estimated 38.6 million illnesses each year, including 5.2 million (13%) due to bacteria, 2.5 million (7%) due to parasites, and 30.9 million (80%) due to viruses (Table 2). Overall, foodborne transmission accounts for 13.8 million of the 38.6 million illnesses (Table 3). Excluding illness caused by *Listeria*, *Toxoplasma*, and hepatitis A virus (three pathogens that typically cause nongastrointestinal illness), 38.3 million cases of acute gastroenteritis are caused by known pathogens, and 13.6 million (36%) of these are attributable to foodborne transmission. Among all illnesses attributable to foodborne transmission, 30% are caused by bacteria, 3% by parasites, and 67% by viruses.

## Hospitalizations

To estimate the number of hospitalizations due to foodborne transmission, we calculated for each pathogen the expected number of hospitalizations among reported cases by multiplying the number of reported cases by pathogen-specific hospitalization rates from FoodNet data (23, 24), reported outbreaks (10, 25), or other published studies (Appendix). Not all illnesses resulting in hospitalization are diagnosed or reported. Health-care providers may not order the necessary diagnostic tests, patients may have already taken antibiotics that interfere with diagnostic testing, or the condition leading to hospitalization may be a sequela that develops well after resolution of the actual infection (e.g., *Campylobacter*-associated Guillain-Barré syndrome). Therefore, to account for underreporting, we doubled the number of hospitalizations among reported cases to derive for each pathogen an estimate of the total number of hospitalizations. Finally, we multiplied this figure by the proportion of infections attributable to foodborne transmission. Because of gaps in the available data, this approach could not be used for some parasitic and viral diseases (Appendix).

Overall, the pathogens listed in Table 2 cause an estimated 181,177 hospitalizations each year, of which 60,854 are attributable to foodborne transmission (Table 3). Excluding hospitalizations for infection with *Listeria*, *Toxoplasma*, and hepatitis A virus, 163,015 hospitalizations for acute gastroenteritis are caused by known pathogens, of which 55,512 (34%) are attributable to foodborne transmission. Overall, bacterial pathogens account for 60% of hospitalizations attributable to foodborne transmission, parasites for 5%, and viruses for 34%.

## Deaths

Like illnesses and hospitalizations, deaths are also underreported. Precise

007733

information on food-related deaths is especially difficult to obtain because pathogen-specific surveillance systems rarely collect information on illness outcome, and outcome-specific surveillance systems (e.g., death certificates) grossly underreport many pathogen-specific conditions. To estimate the number of deaths due to bacterial pathogens, we used the same approach described for hospitalizations: first calculating the number of deaths among reported cases, then doubling this figure to account for unreported deaths, and finally multiplying by the percentage of infections attributable to foodborne transmission. As with hospitalization, this approach could not be used for some parasitic and viral diseases.

Overall, the specified pathogens cause an estimated 2,718 deaths each year, of which 1,809 are attributable to foodborne transmission (Table 3). Excluding death due *to Listeria*, *Toxoplasma*, and hepatitis A virus, the number of deaths due to pathogens that cause acute gastroenteritis is 1,381, of which 931 (67%) are attributable to foodborne transmission. Bacteria account for 72% of deaths associated with foodborne transmission, parasites for 21%, and viruses for 7%. Five pathogens account for over 90% of estimated food-related deaths: *Salmonella* (31%), *Listeria* (28%), *Toxoplasma* (21%), Norwalk-like viruses (7%), *Campylobacter* (5%), and *E. coli* O157:H7 (3%).

### Table 3. Estimated illnesses, hospitalizations, and deaths caused by known foodborne pathogens, United States

| Disease or agent | Illnesses | | | Hospitalizations | | | Deaths | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Food-borne | % of total foodborne | Total | Food-borne | % of total foodborne | Total | Food-borne | % of total foodborne |
| **Bacterial** | | | | | | | | | |
| *Bacillus cereus* | 27,360 | 27,360 | 0.2 | 8 | 8 | 0.0 | 0 | 0 | 0.0 |
| Botulism, foodborne | 58 | 58 | 0.0 | 46 | 46 | 0.1 | 4 | 4 | 0.2 |
| *Brucella* spp. | 1,554 | 777 | 0.0 | 122 | 61 | 0.1 | 11 | 6 | 0.3 |
| *Campylobacter* spp. | 2,453,926 | 1,963,141 | 14.2 | 13,174 | 10,539 | 17.3 | 124 | 99 | 5.5 |
| *Clostridium perfringens* | 248,520 | 248,520 | 1.8 | 41 | 41 | 0.1 | 7 | 7 | 0.4 |
| *Escherichia coli* O157:H7 | 73,480 | 62,458 | 0.5 | 2,168 | 1,843 | 3.0 | 61 | 52 | 2.9 |
| *E. coli*, non-O157 STEC | 36,740 | 31,229 | 0.2 | 1,084 | 921 | 1.5 | 30 | 26 | 1.4 |
| *E. coli*, enterotoxigenic | 79,420 | 55,594 | 0.4 | 21 | 15 | 0.0 | 0 | 0 | 0.0 |
| *E. coli*, other diarrheogenic | 79,420 | 23,826 | 0.2 | 21 | 6 | 0.0 | 0 | 0 | 0.0 |
| *Listeria monocytogenes* | 2,518 | 2,493 | 0.0 | 2,322 | 2,298 | 3.8 | 504 | 499 | 27.6 |
| *Salmonella* typhi | 824 | 659 | 0.0 | 618 | 494 | 0.8 | 3 | 3 | 0.1 |
| *Salmonella*, nontyphoidal | 1,412,498 | 1,341,873 | 9.7 | 16,430 | 15,608 | 25.6 | 582 | 553 | 30.6 |
| *Shigella* spp. | 448,240 | 89,648 | 0.6 | 6,231 | 1,246 | 2.0 | 70 | 14 | 0.8 |
| Staphylococcus food poisoning | 185,060 | 185,060 | 1.3 | 1,753 | 1,753 | 2.9 | 2 | 2 | 0.1 |
| Streptococcus, foodborne | 50,920 | 50,920 | 0.4 | 358 | 358 | 0.6 | 0 | 0 | 0.0 |
| *Vibrio cholerae*, toxigenic | 54 | 49 | 0.0 | 18 | 17 | 0.0 | 0 | 0 | 0.0 |
| *V. vulnificus* | 94 | 47 | 0.0 | 86 | 43 | 0.1 | 37 | 18 | 1.0 |
| *Vibrio*, other | 7,880 | 5,122 | 0.0 | 99 | 65 | 0.1 | 20 | 13 | 0.7 |

007734

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Yersinia enterocolitica* | 96,368 | 86,731 | 0.6 | 1,228 | 1,105 | 1.8 | 3 | 2 | 0.1 |
| Subtotal | 5,204,934 | 4,175,565 | 30.2 | 45,826 | 36,466 | 59.9 | 1,458 | 1,297 | 71.7 |
| **Parasitic** | | | | | | | | | |
| *Cryptosporidium parvum* | 300,000 | 30,000 | 0.2 | 1,989 | 199 | 0.3 | 66 | 7 | 0.4 |
| *Cyclospora cayetanensis* | 16,264 | 14,638 | 0 1 | 17 | 15 | 0.0 | 0 | 0 | 0.0 |
| *Giardia lamblia* | 2,000,000 | 200,000 | 1.4 | 5,000 | 500 | 0.8 | 10 | 1 | 0.1 |
| *Toxoplasma gondii* | 225,000 | 112,500 | 0.8 | 5,000 | 2,500 | 4.1 | 750 | 375 | 20.7 |
| *Trichinella spiralis* | 52 | 52 | 0.0 | 4 | 4 | 0.0 | 0 | 0 | 0 0 |
| Subtotal | 2,541,316 | 357,190 | 2.6 | 12,010 | 3,219 | 5.3 | 827 | 383 | 21.2 |
| **Viral** | | | | | | | | | |
| Norwalk-like viruses | 23,000,000 | 9,200,000 | 66.6 | 50,000 | 20,000 | 32.9 | 310 | 124 | 6.9 |
| Rotavirus | 3,900,000 | 39,000 | 0.3 | 50,000 | 500 | 0.8 | 30 | 0 | 0.0 |
| Astrovirus | 3,900,000 | 39,000 | 0.3 | 12,500 | 125 | 0.2 | 10 | 0 | 0.0 |
| Hepatitis A | 83,391 | 4,170 | 0.0 | 10,841 | 90 | 0.9 | 83 | 4 | 0.2 |
| Subtotal | 30,833,391 | 9,282,170 | 67.2 | 123,341 | 21,167 | 34.8 | 433 | 129 | 7.1 |
| Grand Total | 38,629,641 | 13,814,924 | 100 0 | 181,177 | 60,854 | 100.0 | 2,718 | 1,809 | 100.0 |

## Food-Related Illness and Death from Unknown Pathogens

Some proportion of gastrointestinal illness is caused by foodborne agents not yet identified. This conclusion is supported by well-documented foodborne outbreaks of distinctive illness for which the causative agent remains unknown (e.g., Brainerd diarrhea) (26), by the large percentage of foodborne outbreaks reported to CDC for which no pathogen is identified (25), and by the large number of new foodborne pathogens identified in recent years.

To estimate food-related illness and death from unknown pathogens, we used symptom-based data to estimate the total number of acute gastrointestinal illnesses and then subtracted from this total the number of cases accounted for by known pathogens; this difference represents the illness due to acute gastroenteritis of unknown etiology. To determine how much of this illness was due to foodborne transmission, we used the percentages of foodborne transmission as determined above for acute gastroenteritis caused by known pathogens.

## Total Cases

To determine the rate of acute gastroenteritis in the general population, we used data on the frequency of diarrhea from the 1996 to 1997 FoodNet population survey. This survey did not collect data on the rate of vomiting among persons without diarrhea, however, so we relied on the Tecumseh and Cleveland studies for information on the frequency of this symptom. Because young children were overrepresented in the Tecumseh and Cleveland studies relative to the current U.S. population, rates of illness for these studies were age-adjusted. For the Tecumseh data, we used the reported age- and symptom-specific rates. For the Cleveland study, we used the method described by Garthright (27) to derive an overall age-adjusted rate of gastrointestinal

illness; we then multiplied this rate by the relative frequency of symptoms to derive age-adjusted rates for specific symptoms.

In the 1996-97 FoodNet population survey, the overall rate of diarrhea was 1.4 episodes per person per year, and the rate of diarrheal illness, defined as diarrhea ( 3 loose stools per 24-hour period) lasting >1 day or interfering with normal activities, was 0.75 episodes per person per year (H. Herikstad, manuscript in preparation). We used the lower 0.75 rate for our analysis. To this we added the average age-adjusted rate of vomiting without diarrhea from the Tecumseh and Cleveland studies (0.30, Table 4) to derive an overall estimate of 1.05 episodes per person per year of acute gastrointestinal illness characterized by diarrhea, vomiting, or both.

**Table 4. Frequency of gastrointestinal illness in the general population, in episodes per person per year, as determined by three studies**

| Symptom | FoodNet Population Survey | Tecumseh Study | | Cleveland Study | |
|---|---|---|---|---|---|
| | Age adjusted | Crude | Age adjusted | Crude | Age adjusted |
| Diarrhea or vomiting | -- | 0.98 | 0.81 | 1.28 | 0.87 |
| Diarrhea, any | 0.75 | 0.63 | 0.52 | 0.83 | 0.56 |
| Without vomiting | 0.61 | 0.40 | 0.33 | 0.48 | 0.33 |
| With vomiting | 0.14 | 0.23 | 0.19 | 0.35 | 0.23 |
| Vomiting without diarrhea | -- | 0.35 | 0.29 | 0.45 | 0.31 |

Previous studies have shown that some cases of acute gastrointestinal illness are accompanied by respiratory symptoms; although the causes of these illnesses are generally unknown, such cases have traditionally been attributed to respiratory pathogens (20,27). Data on the frequency of concomitant respiratory symptoms were not collected in the 1996-97 FoodNet survey but were 20% to 27% among patients with acute gastroenteritis in the Tecumseh and Cleveland studies. Therefore, we adjusted downward our estimate of acute gastroenteritis by 25%, yielding a final estimate of 0.79 (1.05 X 0.75) episodes of acute gastroenteritis per person per year. Extrapolated to a population of 267.7 million persons, the U.S. resident population in 1997 (28), this rate is equivalent to 211 million episodes each year in the United States.

As determined previously, 38.3 million of these 211 million episodes of acute gastroenteritis are attributable to known pathogens. A small proportion of the remaining 173 million episodes can be accounted for by known, noninfectious agents (e.g., mycotoxins, marine biotoxins); however, most are attributable to unknown agents. Because we cannot directly ascertain how many of these illnesses of unknown etiology are due to foodborne transmission, we used the relative frequency of foodborne transmission for known pathogens as a guide. For illnesses of known etiology, foodborne transmission accounts for 36% of total cases. Applying this percentage yields an estimate of 62 million cases of

007736

acute gastroenteritis of unknown etiology (36% of 173 million) due to foodborne transmission each year.

## Hospitalizations

The National Ambulatory Medical Care Survey/the National Hospital Ambulatory Medical Care Survey data were searched for visits due to symptoms of diarrhea, vomiting, or gastrointestinal infection (reason for visit classification (RVC) codes 1595, 1530, 1540)(17) and for visits resulting in a diagnosis of infectious enteritis (ICD-9-CM codes 001-009.3; Table 1). Visits associated with respiratory symptoms (RVC codes 1400-1499) or a diagnosis of influenza (ICD-9-CM code 487) were excluded. Data for the years 1992 to 1996 were combined before analysis. Overall, these criteria yielded an average of 15,810,905 visits annually from 1992 through 1996, of which an average of 1,246,763, or 7.9%, resulted in hospitalization. This figure is equivalent to a rate of 4.7 hospitalizations per 1,000 person-years.

The National Hospital Discharge Survey data were searched by using diagnostic codes for infectious gastroenteritis of known cause (ICD-9-CM codes 001-008; Table 1), with the exception of the code for *Clostridium difficile* colitis (ICD9 008.45), a common form of nosocomially acquired diarrhea. In addition, we included the nonspecific ICD-9-CM diagnosis codes 009 (infectious gastroenteritis) and 558.9 (other and unspecified noninfectious gastroenteritis and colitis). Despite the description, many of the illnesses attributed to ICD-9-CM code 558.9 are likely to be either infectious or due to agents possibly transmitted by food. For example, in the absence of laboratory testing, sporadic cases of viral gastroenteritis may be coded as 558.9. Under the previous ICD-8 classification, these same cases would have been assumed to be infectious and coded as 009 (29, 30). Data for the years 1992 to 1996 were weighted according to National Center for Health Statistics criteria and averaged to derive national estimates of annual hospitalizations. Records with a diagnosis of respiratory illness were not excluded because of the high incidence of respiratory infections among hospitalized patients.

Considering all listed diagnoses, the National Hospital Discharge Survey data for the years 1992 to 1996 yielded an annual average of 616,337 hospital discharges with a diagnosis of gastrointestinal illness. Included in this figure are 193,084 cases of gastroenteritis with an identified pathogen and an additional 423,293 cases of gastroenteritis of unknown etiology (Table 5). Converted to a rate, the total number is equivalent to 2.3 hospitalizations per 1,000 person-years. Because these data depend on the recording of a diagnosis and not just a symptom, it is likely that they underestimate the rate of hospitalization for acute gastroenteritis. This view is supported by FoodNet population survey data indicating a rate of approximately 7.2 hospitalizations per 1,000 person-years for diarrheal illness (H. Herikstad, manuscript in preparation). These data were not included here because they omit hospitalizations for vomiting alone and are not easily adjusted for concomitant respiratory symptoms. Averaging the rates from the National Ambulatory Medical Care Survey/National Hospital Ambulatory Medical Care Survey and National Hospital Discharge Survey yields a final estimate of 3.5 hospitalizations per 1,000 person-years, equivalent to 936,726 hospitalizations

annually for acute gastroenteritis. As noted previously, 163,153 of these hospitalizations can be attributed to known causes of acute gastroenteritis, yielding an estimated 773,573 hospitalizations for acute gastroenteritis caused by unknown agents. Applying the relative frequency of foodborne transmission as determined for known pathogens yields an estimated 263,015 hospitalizations (34% of 773,573) for acute gastroenteritis due to foodborne transmission of unknown agents.

**Table 5. Average annual hospitalizations and deaths for gastrointestinal illness by diagnostic category, National Hospital Discharge Survey, 1992–1996**

| Cause of enteritis[a] | 1st diagnosis | | All diagnoses | |
|---|---|---|---|---|
| | Hospitalizations | Deaths | Hospitalizations | Deaths |
| Bacterial (001-005, 008-008.5) | 27,987 | 148[b] | 54,953 | 1,139 |
| Viral (008.6-008.8) | 82,149 | 0[b] | 132,332 | 194[b] |
| Parasitic (006-007) | 2,806 | 82[b] | 5,799 | 127[b] |
| Unknown etiology (009, 558.9) | 186,537 | 868[b] | 423,293 | 5,148 |
| Total | 299,479 | 1,898 | 616,377 | 6,608 |

[a]ICD-9-CM code.

[b]Estimate unreliable due to small sample size.

## Deaths

Multiple-cause-of-death data ([16]) and information on in-hospital-death data (National Hospital Discharge Survey) were used. ICD-9-CM codes 001-008 were employed to identify deaths due to diagnosed infectious gastroenteritis and ICD-9-CM codes 009 and 558 to identify deaths due to gastroenteritis of unknown etiology.

Death certificate data for the years 1992 to 1996 yielded an annual average of 6,195 total deaths, of which 1,432 (23%) were due to specific causes of gastroenteritis and 4,763 (77%) to undiagnosed causes of gastroenteritis. For the same years and ICD-9-CM codes, the average annual in-hospital deaths for all-listed diagnoses totaled 6,608, of which 1,460 were due to specific and 5,148 (77%) undiagnosed causes of gastroenteritis (Table 5). Averaging the totals for all causes from death certificate and National Hospital Discharge Survey data and adjusting to the 1997 U.S. census estimates, we estimated that gastroenteritis contributed to the death of 6,402 persons in the United States in 1997.

A total of 1,386 of these deaths can be explained by known causes of acute gastroenteritis (see above). Thus an estimated 5,016 deaths from acute gastroenteritis are caused by unknown agents. Applying the relative frequency of foodborne transmission as determined for known pathogens yields an

estimated 3,360 deaths (67% of 5,016) due to acute gastroenteritis caused by
foodborne transmission of unknown agents.

## Overall Food-Related Illness and Death

We summed illness attributable to foodborne
gastroenteritis caused by known and unknown
pathogens, yielding an estimate of 76 million
illnesses, 318,574 hospitalizations, and 4,316
deaths. Adding to these figures the
nongastrointestinal illness caused by *Listeria*,
*Toxoplasma*, and hepatitis A virus, we arrived at a
final national estimate of 76 million illnesses,
323,914 hospitalizations, and 5,194 deaths each
year (Figure 1).

**Figure 1**



Click to view enlarged
image
**Figure: Estimated
frequency of foodborne
illness in the United
States.**

## Conclusions

The nature of food and foodborne illness has
changed dramatically in the United States over the last century. While
technological advances such as pasteurization and proper canning have all but
eliminated some disease, new causes of foodborne illness have been identified.
Researchers have used various methods to estimate the illnesses and deaths
due to foodborne diseases in the United States. In 1985, Archer and Kvenberg
coupled information on underreporting of salmonellosis with data on other
foodborne pathogens to derive estimates of 8.9 million illnesses due to known
pathogens and 24 million to 81 million illnesses due to all foodborne agents
(2). In 1987, Bennett et al. computed incidence figures for all known
infectious diseases and determined the proportion of each due to various
modes of transmission. Summing these figures, they concluded that foodborne
transmission of known pathogens caused 6.5 million illnesses and up to 9,000
deaths each year (3). In 1989, Todd used a combination of methods, including
extrapolation from Canadian surveillance data, to derive an estimate of 12.5
million foodborne illnesses and 522 related deaths each year (4). Finally, in
1994, a task force convened by the Council for Agricultural Science and
Technology (CAST) reviewed available studies and estimated the overall
number of food-related illnesses at 33 million cases per year (5). These various
estimates often refer to different entities. The estimates of 6.5 million and 8.9
million refer to illness caused by known pathogens, whereas the estimate of 33
million refers to all causes of foodborne illnesses, known and unknown,
infectious and noninfectious.

Our estimates are based on data from a wide variety of sources and differ from
previous estimates in several respects. For known pathogens, our estimate of
13.8 million illnesses per year is substantially higher than the previous
estimates of 6.5 million and 8.9 million (2, 3), an increase attributable largely
to our inclusion of foodborne illness caused by Norwalk-like viruses. For
foodborne illness of all etiologies, our estimate of 76 million illnesses is within
the range proposed by Archer and Kvenberg (2) but considerably higher than
the point estimate of 33 million presented in the CAST report (5). Both our

estimate and the CAST estimate assume that foodborne transmission accounts for ~35% of acute gastroenteritis cases caused by unknown agents. The disparity between the two stems from differences in the estimated annual frequency of acute gastroenteritis overall: 211 million cases for our estimate, 99 million for the CAST estimate.

Whereas our estimates of illness are generally higher than those of previous studies, our estimates of death are generally lower. We estimate that foodborne illness causes 5,020 deaths annually (1,810 deaths due to known pathogens and 3,210 deaths due to unknown agents), a total that is slightly more than half the 9,000 deaths estimated by Bennett et al. (3). The Bennett estimate includes 2,100 deaths due to campylobacteriosis, 1,200 deaths due to staphylococcal food poisoning, and 1,000 deaths due to trichinosis: our total for all three of these diseases is 101 deaths. Our estimated case-fatality rates for several other diseases are also lower than those used in the Bennett report, either because better data are available or perhaps because treatment has improved.

Our analysis suggests that unknown agents account for approximately 81% of foodborne illnesses and hospitalizations and 64% of deaths. Among cases of foodborne illness due to known pathogens, Norwalk-like viruses account for over 67% of all cases, 33% of hospitalizations, and 7% of deaths. The assumptions underlying the Norwalk-like viruses figures are among the most difficult to verify, and these percentages should be interpreted with caution (Appendix). Other important causes of severe illness are *Salmonella* and *Campylobacter*, accounting for 26% and 17% of hospitalizations, respectively. The leading causes of death are *Salmonella, Listeria,* and *Toxoplasma*, which together account for 1,427, or more than 75% of foodborne deaths caused by known pathogens. Many of the deaths due to toxoplasmosis occur in HIV-infected patients; recent advances in HIV treatment may greatly reduce deaths due to toxoplasmosis.

Of necessity, our analysis entails a number of assumptions. The first major assumption concerns the degree of underreporting. Well-documented estimates of underreporting are not available for most pathogens; therefore, we relied on multipliers derived for salmonellosis and other diseases. For salmonellosis, the multiplier of 38 has been independently derived by investigators in the United States using different data sources. The U.S. figure is five to tenfold higher than multipliers for *Salmonella* and *Campylobacter* recently derived in Great Britain (31). However, this difference is nearly or wholly offset by far higher per capita rates of reported infections in Great Britain. Nevertheless, when extrapolated to other pathogens, these multipliers may result in under- or overestimates, and clearly studies such as those conducted for *Salmonella* are needed to develop better multipliers for these other diseases. However, in our analysis, changing the multipliers for individual diseases has a minimal effect on the overall estimate of foodborne illness.

Our second set of assumptions concerns the frequency of foodborne transmission for individual pathogens. We have used published studies when available, but these are rare. As with underreporting multipliers, errors affect estimates for individual pathogens but have minimal effect on the estimate of

007740

overall illness and death from foodborne diseases. The one notable exception is the estimate for Norwalk-like viruses. Because these viruses account for an especially large number of illnesses, changes in the percentage attributed to foodborne transmission have a major effect on our overall estimates. For example, if the actual number of infections due to foodborne transmission were 30% rather than 40%, the overall estimate would decrease from 76 million to 63 million illnesses per year. Interestingly, our overall estimate is influenced far less by the Norwalk-like virus case estimate itself. It would require a 100-fold reduction in the estimated number of Norwalk-like virus cases to reduce the overall estimate from 76 million to 63 million.

A third assumption concerns the frequency of acute gastroenteritis in the general population. The rate we used is based in part on recent data from the FoodNet population survey, a retrospective survey involving more than 9,000 households. The overall rate of diarrhea as recorded by the survey was 1.4 episodes per person per year; however, we used the survey's far lower rate of 0.75 episodes of diarrheal illness per person per year. Furthermore, we limited our definition of acute gastroenteritis to symptoms of diarrhea or vomiting and reduced the rate to account for concomitant respiratory symptoms. As a result, our final assumed rate of 0.79 episodes of acute gastroenteritis per person per year is very similar to respiratory-adjusted estimates derived from the prospectively conducted Tecumseh (0.74) and Cleveland (0.71) studies (27). All three studies are based on household surveys, and thus the rates of illness are not influenced by changes in health-care delivery. Compared with rates of diarrheal illness from studies conducted in Great Britain, our estimated rate is higher than in one recent study (31) but lower than another (32).

In addition to these assumptions, our analysis has several limitations. Differences in available surveillance information prevented us from using the same method to estimate illness and death from bacterial, parasitic, and viral pathogens. Furthermore, because of a paucity of surveillance information, we did not include specific estimates for some known, occasionally foodborne pathogens (e.g., *Plesiomonas, Aeromonas,* or *Edwardsiella)*, nor did we develop specific estimates for known noninfectious agents, such as mushroom or marine biotoxins, metals, and other inorganic toxins. However, many of these agents cause gastroenteritis and are therefore captured in our overall estimate of foodborne illness. With the exception of a few important pathogens (Appendix), we have not estimated the number of cases of chronic sequelae, although these may be part of the overall burden of foodborne diseases. Finally, future research will refine our assumptions and allow for more precise estimates.

Methodologic differences between our analysis and previously published studies make it difficult to draw firm conclusions regarding overall trends in the incidence of foodborne illness. In general, the differences between our estimates and previously published figures appear to be due primarily to the availability of better information and new analyses rather than real changes in disease frequency over time. For example, *E. coli* O157:H7 was estimated to cause 10,000 to 20,000 illnesses annually, based on studies of patients visiting a physician for diarrhea. Recent FoodNet data have allowed a more detailed estimation of mild illnesses not resulting in physician consultation. Our

007741

estimate of nearly 74,000 illnesses per year incorporates these milder illnesses and should not be misconstrued as demonstrating a recent increase in *E. coli* O157:H7 infections. Whatever the limitations on retrospective comparisons, the estimates presented here provide a more reliable benchmark with which to judge the effectiveness of ongoing and future prevention efforts.

Further refinements of foodborne disease estimates will require continued and improved active surveillance. Beginning in 1998, the FoodNet population survey was modified to capture cases of vomiting not associated with diarrhea; further enhancement to capture concomitant respiratory symptoms should refine the FoodNet survey data. Expansion of laboratory diagnostic capacity could lead to better detection of certain pathogens, estimates of the degree of underreporting for additional diseases, and estimates of the proportion of specific diseases transmitted through food. Heightened surveillance for acute, noninfectious foodborne diseases, such as mushroom poisoning and other illnesses caused by biotoxins, could further improve estimates of illness and death from foodborne illness. Emergency department-based surveillance systems (33) or poison control center-based surveillance might provide such information. Finally, identifying new causes of enteric illness and defining the public health importance of known agents (e.g., enteroaggregative *E. coli*) would improve foodborne disease prevention efforts.

### Appendix

Methods, assumptions, and references for pathogen-specific estimates

### Bacterial Pathogens

**Pathogen:** *Bacillus cereus*

**Reported cases:** Cases not routinely reported. Because it is a mild illness, reported cases assumed to be 10 times the average annual number of outbreak-related cases reported to CDC, 1983-1992 (10,25).

**Total cases:** Assumed to be 38 times the number of reported cases by extrapolation from studies of salmonellosis.

**Hospitalization rate:** Determined from outbreaks reported to CDC, 1982-1992 (10,25) and (CDC, unpub. data).

**Case-fatality rates:** Determined from outbreaks reported to CDC, 1982-1992 (10,25), including those associated with nursing homes (34).

**Percent foodborne:** Although infection occasionally occurs through other routes, case estimates presented are based on foodborne outbreaks and are therefore assumed to reflect only foodborne transmission.

**Pathogen:** *Clostridium botulinum*

**Reported cases:** Average annual number of cases of foodborne botulism

007742

reported to CDC, 1992-1997 (7).

**Total cases:** Because it is a severe illness, assumed to be two times the number of reported cases.

**Hospitalization rate:** Determined from outbreaks reported to CDC, 1982-1992 (10,25) and (CDC, unpub. data).

**Case-fatality rate:** Based on outbreaks reported to CDC, 1982-1992 (10,25).

**Percent foodborne:** 100% by definition.

**Pathogen:** *Brucella* spp.

**Reported cases:** Average annual number of cases reported

to CDC, 1992-1997 (7).

**Total cases:** Assumed to be 14 times reported cases, based on published estimates that 4% to 10% of cases are reported (35).

**Hospitalization rate:** Determined from outbreaks reported to CDC, 1982-1992 (10,25) and (CDC, unpub. data).

**Case-fatality rate:** Historically 2% to 5% (36)

**Percent foodborne:** Overall, consumption of milk or cheese products from Mexico implicated in 45% of cases reported from California from 1973 to 1992 (37). Because the proportion of cases due to foodborne transmission was higher in the latter half of this period, we assumed that currently 50% of cases are foodborne.

**Comments:** Reports from California or Texas account for most of cases in recent years.

**Pathogen:** *Campylobacter* spp.

**Reported cases:** Outbreak-related cases based on reports to CDC, 1983-1992 (10,25). Passive surveillance estimate based on average number of cases reported to CDC, 1992-1994 (CDC, unpub data). Active surveillance estimate based on extrapolation of average 1996-1997 FoodNet rate (24.1 cases per 100,000 population) to 1997 U.S. population (23).

**Total cases:** Assumed to be 38 times the number of reported cases, based on studies of salmonellosis. Resulting estimate is roughly comparable with midpoint rate estimate from Tauxe (38) for *C. jejuni* (1,020 cases per 100,000 population), applied to 1997 population. Assumes minimal contribution from non-jejuni *Campylobacter*.

**Hospitalization rate:** Based on hospitalization rate for culture-confirmed

cases reported to FoodNet, 1996-1997 (23,24).

**Case-fatality rate:** Based on case-fatality rate for culture-confirmed cases reported to FoodNet, 1996-1997 (23,24).

**Percent foodborne:** Although waterborne outbreaks occur, foodborne transmission accounts for most of the sporadic cases (38).

**Comments:** Guillain-Barré syndrome (GBS) is an acute flaccid paralysis that can occur several weeks after infection with various agents, including *Campylobacter*. The incidence of GBS has been estimated at 1.7 cases per 100,000 population, and serologic studies suggest that ~30% of patients with GBS have evidence of recent infection with *Campylobacter* (39). Based on these figures, we estimate that ~1,360 cases of *Campylobacter*-associated GBS occurred in the United States in 1997.

**Pathogen:** *Clostridium perfringens*

**Reported cases:** Cases not routinely reported. Because it is a mild illness, number of reported cases assumed to be 10 times the average annual number of outbreak-related cases reported to CDC, 1983-1992 (10,25).

**Total cases:** Assumed to be 38 times the number of reported cases, by extrapolation from studies of salmonellosis.

**Hospitalization rate:** Determined from outbreaks reported to CDC, 1982-1992 (10,25) and (CDC, unpub. data).

**Case-fatality rate:** Based on reported outbreaks, 1983-1992 (10,25).

**Percent foodborne:** 100% (40). Case estimates presented are based on foodborne outbreaks and therefore reflect foodborne transmission of *C. perfringens*, type A.

**Pathogen:** *Escherichia coli* O157:H7

**Reported cases:** Passive surveillance estimate based on average number of cases reported to CDC through the National Electronic Telecommunications System for Surveillance (NETSS), 1995-1998; data from the Public Health Laboratory Information System (PHLIS) were used for those states not reporting to NETSS during this time period (7). Passive surveillance data for 1998 are provisional. Active surveillance estimate based on an extrapolation of a weighted average of the FoodNet rate for the years 1996-1997 to the 1997 U.S. population (23,24). A weighted average was used because the overall FoodNet rate is disproportionately influenced by a high rate in a single northern state with a relatively small population. Because the incidence of infection is thought to be generally higher in northern states (41), we weighted the crude rate derived from FoodNet by the total population of each participating state. The weighted rate (1.34 cases per 100,000 population) was used when extrapolating the FoodNet rate to the total U.S. population.

007744

**Total cases:** Studies conducted in FoodNet sites suggest that 13-27 cases of *E. coli* O157:H7 infection occur in the community for each confirmed case that is reported (22). To estimate total cases, we multiplied the number of reported cases, as determined through active surveillance, by 20, the midpoint of this estimate.

**Hospitalization rate:** Based on the hospitalization rate for culture-confirmed cases reported to FoodNet, 1996-1997 (23,24).

**Case-fatality rate:** Case-fatality rate based on mortality associated with sporadic cases reported to FoodNet, 1996-1997 (23,24).

**Percent foodborne:** Based on outbreaks of known source reported to CDC, 1982-1997 (CDC, unpub. data). Person-to-person transmission assumed to be secondary to foodborne transmission (2).

**Comments:** Our estimate of total cases is considerably higher than previous estimates based on patients seeking care for diarrhea. Our estimate includes patients with far milder illness and should not be interpreted as indicating an increase in incidence. Hemolytic uremic syndrome (HUS) occurs in ~4% of all reported cases. Based on our estimate of total cases and active surveillance cases, between 2,954 and 147 patients are expected to contract HUS each year.

**Pathogen:** *E. coli*, Shiga toxin-producing serogroups other than O157 (STEC)

**Reported cases:** Cases not routinely reported; many clinical laboratories cannot identify.

**Total cases:** Assumed to be half as common as infection with *E. coli* O157:H7. Early studies suggest that the incidence of non-O157 STEC infections is 20%-30% that of *E. coli* O157:H7 in North America (42, 43); however, more recent studies using different techniques suggest that this figure should be 50% (44,45).

**Hospitalization rate:** Assumed to be comparable with *E. coli* O157:H7, but may be lower (46).

**Case-fatality rate:** Assumed to be comparable with *E. coli* O157:H7, but may be lower (46).

**Percent foodborne:** Assumed to be comparable with *E. coli* O157:H7.

**Comment:** Although non-O157 STEC can cause hemolytic uremic syndrome, the relative frequency of this complication is unknown. Reports from Canada suggest that non-O157 STEC are the cause of at least 7% (47) and possibly as many as 20% (48) of HUS cases.

**Pathogen:** *E. coli,* enterotoxigenic

**Reported cases:** Not routinely reported. Outbreak-related cases based on

007745

average for 18 outbreaks reported to CDC from 1975 through 1997 (CDC, unpub. data). Reported cases assumed to be 10 times the number of outbreak-related cases.

**Total cases**: Assumed to be 38 times the number of reported cases by extrapolation from studies of salmonellosis.

**Hospitalization rate:** Low; assumed to be 0.5% of cases.

**Case-fatality rate:** Serious illness is generally restricted to infants in developing countries. Based on experience with reported outbreaks, assumed to be 1 in 10,000 cases in the United States.

**Percent foodborne:** Nearly all outbreaks reported to CDC from 1975 through 1997 have been foodborne (CDC, unpub. data); many sporadic cases are associated with travel to other countries where both water and foodborne exposures are likely.

**Pathogen:** *E. coli,* other diarrheogenic

**Reported cases:** Not routinely reported. Assumed to be at least as common as enterotoxigenic *E. coli* (ETEC) based on limited information from studies in North America and Europe (49).

**Total cases:** Assumed equal to ETEC.

**Hospitalization rate:** Assumed equal to ETEC.

**Case-fatality rate:** Assumed equal to ETEC.

**Percent foodborne:** Very little data available. As few foodborne outbreaks have been reported, it is assumed that only 30% of cases are foodborne.

**Comment:** This category includes enteropathogenic, enteroaggregative, and enteroinvasive *E. coli*, as well as poorly defined pathogenic groups (50). Although little is known about the incidence of these infections in the United States, these pathogens have been linked to both outbreaks and sporadic illnesses. Limited studies suggest that the importance of some of these organisms in the United States is seriously underestimated (see Nataro and Kaper [49]). Although clearly a heterogeneous collection of organisms, we assume that these pathogens as a group have similar modes of transmission and mortality rates as ETEC.

**Pathogen:** *Listeria monocytogenes*

**Reported cases:** Rates from FoodNet, 1996-1997, (23,24) and comparable sentinel site surveillance (51), extrapolated to the 1997 U.S. population.

**Total cases:** Because it is a severe illness, assumed to be 2 times the number of reported cases.

007746

**Hospitalization rate:** Based on hospitalization rate for culture-confirmed cases reported to FoodNet, 1996-1997 (23,24).

**Case-fatality rate:** Based on published reports (51), 1996-1997 FoodNet data (23,24), and recent outbreaks (CDC, unpub. data).

**Percent foodborne:** Although foodborne transmission accounts for all reported domestic outbreaks (52), the potential for nosocomial transmission has been demonstrated (53).

**Comments:** Figures include both perinatal and nonperinatal disease. FoodNet data on hospitalization indicate that nearly 90% of reported cases result in hospitalization (24).

**Pathogen:** *Salmonella* Typhi

**Reported cases:** Average number of cases reported to CDC, 1992-1997 (7).

**Total cases:** Because it is a severe illness, assumed to be two times the number of reported cases.

**Hospitalization rate:** Rate of hospitalization based on published outbreak reports (54,55).

**Case-fatality rate:** Based on outcomes of 2,254 cases reviewed by Mermin (56).

**Percent foodborne:** Although waterborne outbreaks have been reported in the United States, foodborne transmission is believed to account for most cases (3).

**Comments:** Over 70% percent of reported cases are associated with foreign travel (56).

**A. Pathogen:** *Salmonella*, nontyphoidal

**B. Reported cases:** Outbreak-related cases based on reports to CDC, 1983-1992 (10,25). Passive surveillance estimate based on average number of cases reported to CDC, 1992-1997 (57). Active surveillance estimate based on extrapolation of the average 1996-1997 FoodNet rate to the 1997 U.S. population (23).

**Total cases:** Assumed to be 38 times the number of reported cases based on FoodNet data (Voetsch, manuscript in preparation) and the "sequential surveillance artifact" multiplier derived by Chalker and Blaser (21).

**Hospitalization rate:** Based on hospitalization rate for culture-confirmed cases reported to FoodNet, 1996-1997 (23,24).

**Case-fatality rate:** Average case-fatality rate among cases reported to

007747

FoodNet, 1996-1997 (23,24). This rate is lower than the previously published rate of 1.3% (58).

**Percent foodborne:** Although occasionally associated with exposure to pets, reptiles, and contaminated water, salmonellosis is primarily a foodborne disease (59).

**Pathogen:** *Shigella* spp.

**Reported cases:** Outbreak-related cases based on reports to CDC, 1983-1992 (10,25). Passive surveillance estimate based on average number of cases reported annually to CDC, 1992-1997 (57). Active surveillance estimate based on extrapolation of average 1996-1997 FoodNet rate to the 1997 U.S. population (23).

**Total cases:** Because *Shigella* frequently causes bloody diarrhea, total cases assumed to be 20 times the number of reported cases, based on similarity to *E. coli* O157:H7.

**Hospitalization rate:** Based on hospitalization rate for culture-confirmed cases reported to FoodNet, 1996-1997 (23,24).

**Case-fatality rate:** Average case-fatality rate among cases reported to FoodNet, 1996-1997 (23,24).

**Percent foodborne:** Assumed to be 20%. Although most cases are due to person-to-person transmission (60), foodborne outbreaks are responsible for a substantial number of cases (61).

**Pathogen:** *Staphylococcus aureus* (enterotoxin)

**Reported cases:** Not routinely reported. Assumed to be 10 times the number of foodborne outbreak-related cases reported to CDC, 1983-1992 (10,25).

**Total cases:** Assumed to be 38 times the number of reported cases, by extrapolation from studies of salmonellosis.

**Hospitalization rate:** Determined from outbreaks reported to CDC, 1982-1992 (10,25), (CDC, unpub. data), and published reports (62).

**Case-fatality rate:** Determined from reported outbreaks to CDC, 1977-1992 (10,25,63).

**Percent foodborne:** 100% by definition. Case estimates presented are based on foodborne outbreaks and therefore reflect foodborne transmission.

**Comment:** The number of outbreak-associated cases of staphylococcal food poisoning reported to CDC has decreased substantially since 1973 (Bean and Griffin, 1990). This decrease is unlikely to be an artifact of decreased recognition: there has been no compensatory increase in the number

007748

offoodborne outbreaks of unknown etiology with an incubation period consistent with staphylococcal food poisoning (CDC, unpub. data).

**Pathogen:** *Streptococcus,* Group A

**Reported cases:** Not routinely reported. Assumed to be 10 times the number of foodborne outbreak-related cases reported to CDC, 1982-1992 (10,25).

**Total cases:** Assumed to be 38 times the number of reported cases, by extrapolation from studies of salmonellosis.

**Hospitalization rate:** Determined from outbreaks reported to CDC, 1982-1992 (10,25) and CDC, unpub. data.

**Case-fatality rate:** Determined from outbreaks reported to CDC, 1982-1992 (10).

**Percent foodborne:** 100% foodborne by definition. Case estimates presented are based on foodborne outbreaks and therefore reflect foodborne transmission.

**Pathogen:** *Vibrio cholerae,* toxigenic O1 or O139

**Reported cases:** Based on cases reported to CDC, 1988-1997 (7).

**Total cases:** Assumed that the number of clinically significant illnesses is two times the number of reported cases.

**Hospitalization rate:** Based on cases reported to CDC, 1992-1994 (64).

**Case-fatality rate:** Based on cases reported to CDC, 1992-1994 (64).

**Percent foodborne:** Assumed to be primarily foodborne. Most reported cases linked to foodborne outbreaks, and at least 65% of sporadic cases may be foodborne (64).

**Comments:** 96% of cases acquired abroad (64).

**Pathogen:** *Vibrio vulnificus*

**Reported cases:** Cases reported to CDC from 22 states, 1988-1996 (65).

**Total cases:** Because it is a severe illness, assumed to be two times the number of reported cases.

**Hospitalization rate:** Based on overall rate among cases reported to CDC, 1988-1996 (65).

**Case-fatality rate:** Based on overall rate among cases reported to CDC, 1988-1996; death rate higher among cases due to foodborne transmission (65).

007749

**Percent foodborne:** Based on Shapiro et al. (65).

**Comment:** Most cases are reported by Gulf States (Florida, Alabama, Louisiana, Texas).

**Pathogen:** *Vibrio,* other spp.

**Reported cases:** Passive surveillance estimate based on cases reported to CDC, 1988-1996 (CDC, unpub. data). Active surveillance estimate based on 1996 FoodNet rate extrapolated to the 1997 U.S. population (23). FoodNet data from 1997 not included because of a large outbreak of *Vibrio parahaemolyticus* infections that could falsely elevate the overall rate.

**Total cases:** Because it is a moderately severe illness, total cases assumed to equal 20 times the reported cases, a degree of underreporting comparable with *E. coli* O157:H7 infections.

**Hospitalization rate:** Based on rate among non-*vulnificus*, non-*cholerae* O1 cases reported by Hlady (66).

**Case-fatality rate:** Based on rate among non-*vulnificus*, non-*cholerae* O1 cases reported by Hlady (66).

**Percent foodborne:** Based on history of shellfish consumption for cases reported by Hlady (66)

**Comment:** Because of larger sample size, data from Hlady (66) used in preference to FoodNet data for hospitalization and death rates.

**Pathogen:** *Yersinia enterocolitica*

**Reported cases:** Active surveillance estimate based on extrapolation of average 1996-1997 FoodNet rate to the 1997 U.S. population (23,24).

**Total cases:** Assumed to be 38 times the number of reported cases, based on studies of salmonellosis.

**Hospitalization rate:** Based on the hospitalization rate for culture-confirmed cases reported to FoodNet, 1996-1997 (23,24).

**Case-fatality rate:** Low, assumed to be 0.5% (23).

**Percent foodborne:** Assumed to be 90%. Nearly all reported outbreaks in United States have been linked to contaminated foods, and pork is specifically believed to be the source of most infections (67).

**Parasitic Pathogens**

**Pathogen:** *Cryptosporidium parvum*

007750

**Reported cases:** Passive surveillance estimate based on the average annual number of cases reported to CDC, 1995-1997 (7). Active surveillance estimate based on extrapolation of the average 1997-98 FoodNet rate to the 1997 U.S. population (6,24).

**Total cases**: Published studies suggest that ~2% of all stools tested for *Cryptosporidium* are positive (68, 69). We assume this rate of infection applies to all patients visiting a health-care provider for acute gastroenteritis. Using an estimate of ~15 million physician visits for diarrhea each year (see text), we estimate there are approximately 300,000 cases of cryptosporidiosis per year. This figure is 45-fold higher than the estimated number of reported cases based on FoodNet active surveillance, a multiplier only slightly larger than the one used for salmonellosis.

**Hospitalization rate:** Based on the hospitalization rate for culture-confirmed cases reported to FoodNet, 1997-1998 (6,24).

**Case-fatality rate:** Average case-fatality rate among cases reported to FoodNet, 1997-1998 (6,24).

**Percent foodborne:** Based on very limited information (70-72), we assume that 10% of cases are attributable to foodborne transmission, with the rest due to consumption of contaminated water or person-to-person transmission.

**Comment:** Cryptosporidiosis in AIDS is associated with a severe protracted course of diarrhea (73).

**Pathogen:** *Cyclospora cayetanensis*

**Reported cases:** Passive surveillance estimate based on average annual number of cases reported to CDC, 1995-1997 (7). Active surveillance estimate based on extrapolation of average 1997-1998 FoodNet rate to the 1997 U.S. population (6,24).

**Total cases:** Assumed to be 38 times the number of reported cases based on studies of salmonellosis.

**Hospitalization rate:** Based on the hospitalization rate for culture-confirmed cases reported to FoodNet, 1997 (24).

**Case-fatality rate:** Very low (74,75). Assumed to be 0.05%, comparable with *Clostridium perfringens*.

**Percent foodborne:** Assumed 90% foodborne, based on recent reported outbreaks (74,75).

**Pathogen:** *Giardia lamblia*

**Reported cases:** Not routinely reported.

007751

**Total cases:** Sensitive surveillance in two sites (Vermont and Wisconsin) suggests a rate of 40 cases per 100,000 persons per year (76,77). In addition, an estimated 5% of all cases are reported. Thus, approximately 100,000 cases will be detected each year, representing 2,000,000 actual cases.

**Hospitalization rate:** An estimated 5,000 cases per year are severe enough to require hospitalization.

**Case-fatality rate:** Exceedingly low. Assumed to be no more than 10 deaths annually.

**Percent foodborne:** Assumed to be 10%. Recreational water is probably the major source of transmission (76-78); however, several foodborne outbreaks have been reported (79,80).

**Pathogen:** *Toxoplasma gondii*

**Reported cases:** Not routinely reported.

**Total cases:** Based on national serologic data collected during the 1994 NHANES, approximately 40% of persons $\geq$60 years old are seropositive for toxoplasmosis (CDC, unpub. data). Assuming equal rates of infection over time, at least 0.6% of the population experiences an acute infection each year, representing approximately 1,500,000 infections per year. Approximately 15% of infections are symptomatic.

**Hospitalization rate:** Varies widely according to host immune status. Data from NHDS indicate that from 1992 to 1996, toxoplasmosis was the first listed diagnosis for approximately 5,000 hospital discharges each year. We have used this figure as a conservative estimate of the number of actual hospitalizations.

**Case-fatality rate:** Varies widely according to host immune status. Of the approximately 5,000 hospital discharges annually for which toxoplasmosis is the first listed diagnosis, approximately 750 involve a deceased patient. We have used this figure as a conservative estimate of the number of actual deaths.

**Percent foodborne:** Although the proportion associated with eating contaminated food varies by geographic region, we assume an overall average of 50%. Recent unpublished data from Europe suggest that 60% of acute infections are from contaminated food (Ruth Gilbert, pers. comm.).

**Comment:** Typically, infection with *Toxoplasma gondii* produces an asymptomatic illness or a mild viral-like febrile illness with lymphadenopathy. Acute diarrhea is not commonly associated with acute infection. Estimates from the Massachusetts Department of Health suggest that one case of congenital toxoplasmosis occurs for every 10,000 births (81). Extrapolating to 4,000,000 live births in the United States, an estimated 400 children are born with congenital toxoplasmosis. Based on calculations by investigators from Stanford University, each year approximately 6,000 women who experience

an acute infection during pregnancy and who do not receive treatment give birth to a child with congenital toxoplasmosis, which results in chronic sequelae (82). During an outbreak of toxoplasmosis in British Columbia, of an estimated 2,900-7,700 infections, 19 cases of retinitis were reported. If there are at least 150,000 symptomatic cases annually, from 300 to 1,050 cases (0.2% to 0.7%, respectively) of ocular toxoplasmosis could occur. If there are 300,000 cases, from 600 to 2,100 ocular cases could occur. Thus, there could be from 300 to 2,100 ocular cases of toxoplasmosis annually. An estimated 4,000 persons with AIDS develop *Toxoplasma* encephalitis annually. In summary, from (400+300+4,000) = 4,700 to (6,000+2,100+4,000) = 12,100 persons develop chronic sequelae due to toxoplasmosis each year.

**Pathogen:** *Trichinella spiralis*

**Reported cases:** Based on NETSS surveillance data, approximately 40 cases are reported annually.

**Total cases:** Because it can be a severe illness, assumed to be two times the number of reported cases.

**Hospitalization rate:** Based on outbreak-related cases reported to CDC, 1982-1992 (10).

**Case-fatality rate:** Assumed to be 0.3% based on data from a large series in Europe.

**Percent foodborne:** 100% (83)

**Comment:** Clinically, acute trichinosis may be asymptomatic or may have acute gastrointestinal symptoms, followed by a parenteral phase of fever and myalgias. In 10% to 20% of cases neurologic or cardiac symptoms develop, many severe and potentially leading to chronic illness.

**Viral Pathogens**

**Pathogen:** Rotavirus

**Reported cases:** Not routinely reported.

**Total cases:** Because every child has at least one symptomatic infection (84-86), the number of cases is assumed to equal the 1997 U.S. birth cohort (3.9 million).

**Hospitalizations:** 50,000 (87,88).

**Case-fatality rate:** Very low: 20 to 40 deaths per year (89).

**Percent foodborne:** probably very low (<1%) (90).

**Pathogen:** Astrovirus

**Reported cases:** Not routinely reported.

**Total cases:** Because every child has at least one symptomatic infection, the number of cases is assumed to equal the 1997 US birth cohort (3.9 million).

**Hospitalizations**: Assumed to equal 25% of number of hospitalizations for rotavirus (= 12,500) (91).

**Case-fatality rate:** Very low (<10 deaths per year).

**Percent foodborne:** Probably very low (<1%) (91).

**Pathogen**: Norwalk-like viruses (NLV).

**Reported cases:** Not routinely reported.

**Total cases:** Very few data are available for assessing the disease burden associated with Norwalk-like viruses, and very few studies have been conducted using the most sensitive diagnostics for NLVs. One community-based study from the Netherlands found 17% of cases of acute gastroenteritis were associated with Norwalk-like viruses, compared with 6% of controls, using reverse transcriptase polymerase chain reaction (RT-PCR) for detection of NLVs (92). An Australian study detected NLVs in 15% of hospitalized patients using immune electron microscopy (93). Studies have generally been conducted exclusively among young children or used less sensitive detection methods (electron microscopy); in these studies, NLVs have been detected in ~1% to 5% of participants (94-98). However, a recent study incorporating RT-PCR for viral detection among children 2 months to 2 years of age found that 21% of cases of acute gastroenteritis were associated with NLVs (99). Given these data, we assume that 11% of all episodes of acute primary gastroenteritis are due to NLVs (using the data from the best of the studies) (92).

**Hospitalizations**: NLV assumed to account for 11% of 452,000 annual hospitalizations for viral gastroenteritis (100).

**Case-fatality rate:** Low. NLV assumed to account for 11% of an estimated 2,800 fatal cases of viral gastroenteritis each year (100).

**Percent foodborne:** We assume that the proportion of all NLV-associated illness that is foodborne is 40%. This estimate is based on a recent report which found that 47% of NLV-associated acute gastroenteritis outbreaks in the United States in which the modes of transmission were known were foodborne (101). Since we would assume that foodborne-associated outbreaks might be more likely to be reported than Norwalk-like virus-associated outbreaks with other mechanisms of spread, the proportion was lowered to 40%. This estimate is in general agreement with other reviews (102-104). No data are available to directly determine the proportion of cases of NLV-associated disease attributable to foodborne transmission.

**Pathogen**: Hepatitis A

**Reported cases:** Based on cases reported to CDC, 1992-1997 (7).

**Total cases:** Assumed to be three times the number of reported cases (105).

**Hospitalizations**: Thirteen percent; based on data from CDC Sentinel Counties Studies (106);

**Case-fatality rate:** 0.3%; based on data from the viral Hepatitis Surveillance Program and the CDC Sentinel Counties Studies (105,107). Deaths calculated by applying the case-fatality rate to reported cases.

**Percent foodborne**: Foodborne transmission accounts for approximately 5% of outbreaks of known source (105). Note that the source is not determined in approximately 50% of hepatitis A outbreaks, and foodborne transmission could account for a far higher percentage of cases.

### Acknowledgments

We thank Fred Angulo, Beth Bell, Thomas Breuer, Cindy Friedman, Roger Glass, Eric Mintz, Steven Ostroff, Morris Potter, David Swerdlow, Tom Van Gilder, and two anonymous reviewers for their comments.

Dr. Mead is a medical epidemiologist with the Foodborne and Diarrheal Diseases Branch, CDC, in Atlanta, Georgia. His professional interests include infectious diseases surveillance, outbreak investigations, and interventions to prevent foodborne illness.

### References

1. Bryan FL. Diseases transmitted by foods. Atlanta: Centers for Disease Control; 1982.

2. Archer DL, Kvenberg JE. Incidence and cost of foodborne diarrheal disease in the United States. J Food Protect 1985;48:887-94.

3. Bennett J, Holmberg S, Rogers M, Solomon S. Infectious and parasitic diseases. In: Amler R, Dull H, editors. Closing the gap: the burden of unnecessary illness. New York: Oxford Univ Press; 1987: 102-14.

4. Todd ECD. Preliminary estimates of costs of foodborne disease in the United States. J Food Protect 1989;52:595-601.

5. Foodborne pathogens: risks and consequences. Ames, IA: Council of Agricultural Science and Technology; 1994.

6. 1998 FoodNet Surveillance Results. Preliminary Report. Atlanta: Centers for Disease Control and Prevention; 1999.

7. Summary of notifiable diseases, United States, 1997. MMWR Morb Mortal Wkly Rep 1997;46(54).

8. Bean NH, Martin SM, Bradford H. PHLIS: an electronic system for reporting public health data from remote sites. Am J Public Health 1992;82:1273-76.

9. Levine W, Griffin P, Gulf Coast Vibrio Working Group. Vibrio infections on the Gulf Coast: results of first year regional surveillance. J Infect Dis 1993;167:479-83.

10. Foodborne disease outbreaks, 5-year summary, 1983-1987. MMWR 1992;39 (SS-1):15-57.

11. Woodwell DA. National Ambulatory Medical Care Survey: 1996 Summary. Advance data from vital and health statistics; no. 295. Hyattsville, Maryland: National Center for Health Statistics; 1997.

12. McCaig LF, McLemore T. Plan and operation of the National Hospital Ambulatory Medical Care Survey. Hyattsville: National Center for Health Statistics; 1994.

13. McCaig LF. National Hospital Ambulatory Medical Care Survey: 1996 Outpatient Department Summary. Advance data from vital and health statistics: no. 294. Hyattsville, Maryland: National Center for Health Statistics; 1997.

14. McCaig LF, Stussman BJ. National Hospital Ambulatory Medical Care Survey: 1996 Emergency Department Summary. Advance data from vital and health statistics: no. 293. Hyattsville, Maryland: National Center for Health Statistics; 1997.

15. Graves EJ, Gillium BS. Detailed diagnoses and procedures, National Hospital Discharge Survey, 1995. National Center for Health Statistics. Vital Health Stat 1997;13.

16. NCHS. Public use data tape documentation. Multiple cause of death for ICD-9. Hyattsville, Maryland: Public Health Service; 1998.

17. Schneider D, Appleton L, McLemore T. A reason for visit classification for ambulatory care. Hyattsville, Maryland: National Center for Health Statistics; 1979.

18. Public Health Service and Health Care Financing Administration. International classification of diseases, 9th Revision, Clinical Modification. Washington D.C.: Public Health Service; 1991.

19. Monto AS, Koopman JS. The Tecumseh Study. XI. Occurrence of acute enteric illness in the community. Am J Epidemiol 1980;112:323-333.

20. Dingle JH, Badger GF, Jordan W. Gastrointestinal illness. In: Illness in the home. A study of 25,000 illness in a group of Cleveland families. Cleveland: The Press of Western Reserve University; 1964: 129-61.

21. Chalker R, Blaser M. A review of human salmonellosis: III. Magnitude of *Salmonella* infection in the United States. Rev Infect Dis 1988;10:111-24.

22. Hedberg C, Angulo F, Townes J, Vugia D, Farley M, FoodNet. Differences in *Escherichia coli* O157:H7 annual incidence among FoodNet active surveillance sites. Baltimore, MD; 1997 June 22-26, 1997.

23. 1996 Final FoodNet surveillance report. Atlanta: Centers for Disease Control and Prevention; 1998.

24. 1997 Final FoodNet surveillance report. Atlanta: Centers for Disease Control and Prevention; 1998.

25. Surveillance for foodborne-disease outbreaksUnited States, 1988-1992. MMWR 1996;45(No. SS-5):2-55.

26. Parsonnet J, Wanke CA, Hack H. Idiopathic chronic diarrhea. In: Blaser MJ, Smith PD, Ravdin JI, Greenberg HB, Guerrant RL, editors. Infections of the gastrointestinal tract. New York: Raven Press, Ltd; 1995: 311-23.

27. Garthright WE, Archer DL, Kvenberg JE. Estimates of incidence and cost of infectious diseases in the United States. Pub Health Reports 1988;103:107-15.

28. Population estimates. Available at <http://www.census.gov/population/www/estimates/popest.html> ed: Bureau of the Census, Economics and Statistics Administration, US Department of Commerce.

29. Helmick CG, Griffin PM, Addiss DG, Tauxe RV, Juranek DD. Infectious diarrheas. In: Everhart JE, editor. Digestive diseases in the United States: epidemiology and impact. U.S. Department of Health and Human Service, National Institutes of Health, National Institute of Diabetes and Digestive Diseases. Washington, D.C.: U.S. Government Printing Office; 1994: 85-123.

30. Dugger BC, Lewis WF. Comparability of diagnostic data coded by the 8th and 9th revisions of the international classification of diseases. Washington, D.C.: U.S. Government Printing Office 1987: DHHS publication no. (PHS) 87-1378. (Vital and health statistics: series 2, no. 104).

31. Wheeler JG, Sethi D, Cowden JM, Wall PG, Rodrigues LC, Tompkins DS, et al. Study of infectious intestinal disease in England: rates in the community, presenting to general practice, and reported to national surveillance. The Infectious Intestinal Disease Study Executive. BMJ 1999;318:1046-50.

32. Feldman RA, Banatvala N. The frequency of culturing stools from adults with diarrhea in Great Britain. Epidemiol Infect 1994;113:41-4.

33. Talan DA, Moran GJ, Mower WR, Newdow M, Ong S, Slutsker L, et al. Emergency ID NET: an emergency department-based emerging infections

sentinel network. Ann Emerg Med 1998;32:703-11.

34. Levine W, Smart J, Archer D, Bean N, Tauxe R. Foodborne disease outbreaks in nursing homes, 1975 through 1987. JAMA 1991;266:2105-09.

35. Taylor JP, Perdue JN. The changing epidemiology of human brucellosis in Texas. Am J Epidemiol 1989;130:160-5.

36. Dalrymple-Champneys W. Brucella infection and undulant fever in man. London: Oxford University Press; 1960.

37. Chomel B, DeBess E, Mangiamele D, Reilly K, Farver T, Sun R, et al. Changing trends in the epidemiology of human brucellosis in California from 1973 to 1992: a shift toward foodborne transmission. J Infect Dis 1994;170:1216-23.

38. Tauxe R. Epidemiology of *Campylobacter jejuni* infections in the United States and other industrialized nations. In: Nachamkin, Blaser M, Tompkins L, editors. *Campylobacter jejuni*: current status and future trends; 1992. p. 9-19.

39. Mishu B, Blaser MJ. Role of infection due to *Campylobacter jejuni* in the initiation of Guillain-Barré syndrome. Clin Infec Dis 1993;17:104-8.

40. Bartlett JG. Gas gangrene (other *Clostridium*-associated diseases). In: Mandell GL, Douglas RG, Bennett JE, editors. Principles and practice of infectious diseases. Third ed. New York: Churchill Livingstone; 1990: 1850-60.

41. Slutsker L, Ries AA, Greene KD, Wells JG, Hutwagner L, Griffin PM. *Escherichia coli* O157:H7 diarrhea in the United States: clinical and epidemiologic features. Ann Intern Med 1997;126:505-13.

42. Pai CH, Ahmed N, Lior H, Johnson WM, Sims HV, Woods DE. Epidemiology of sporadic diarrhea due to verocytotoxin-producing *Escherichia coli*: a two-year prospective study. J Infect Dis 1988;157:1054-7.

43. Bokete TN, O'Callahan CM, Clausen CR, Tang NM, Tran N, Moseley SL, et al. Shiga-like toxin-producing *Escherichia coli* in Seattle children: a prospective study. Gastroenterology 1993;105:1724-31.

44. Acheson DWK, Breuker SD, Donohue-Rolfe A, Kozak K, Yi A, Keusch GT. Development of a clinically useful diagnostic enzyme immunoassay for enterohemorrhagic *Escherichia coli* infection. In: Karmali MA, Goglio AG, editors. Rercent advances in verocytotoxin-producing *Escherichia coli* infections. Amsterdam: Elsevier Science B. V.; 1994: 109-12.

45. Park CH, Gates KM, Vandel NM, Hixon DL. Isolation of Shiga-like toxin producing *Escherichia coli* (O157 and non-O157) in a community hospital. Diagn Microbiol Infect Dis 1996;26:69-72.

46. Tarr PI, Neill MA. Perspective: the problem of non-O157:H7 shiga toxin (Verocytotoxin)-producing *Escherichia coli* [comment]. J Infect Dis 1996;174:1136-9.

47. Rowe PC, Orrbine E, Lior H, Wells GA, McLaine PN. A prospective study of exposure to verotoxin-producing *Escherichia coli* among Canadian children with haemolytic uraemic syndrome. The CPKDRC co-investigators. Epidemiol Infect 1993;110:1-7.

48. Johnson R, Clark R, Wilson J, Read S, Rhan K, Renwick S, et al. Growing concerns and recent outbreaks involving non-O157:H7 serotypes of verocytoxigenic *Escherichia coli*. J Food Protect 1996;59:1112-22.

49. Nataro JP, Kaper JB. Diarrheogenic *Escherichia coli*. Clin Microbiol Rev 1998;11:1-60.

50. Hedberg CW, Savarino SJ, Besser JM, Paulus CJ, Thelen VM, Myers LJ, et al. An outbreak of foodborne illness caused by *Escherichia coli* O39:NM, an agent not fitting into the existing scheme for classifying diarrheogenic *E. coli*. J Infect Dis 1997;176:1625-8.

51. Tappero J, Schuchat A, Deaver K, Mascola L, Wenger J. Reduction in the incidence of human listeriosis in the United States. Effectiveness of prevention efforts. JAMA 1995;273:1118-22.

52. Slutsker L, Schuchat A. Listeriosis in Humans. In: Ryser E, Marth E, editors. *Listeria*, listeriosis, and food safety. New York: Marcel Dekker; 1999: 75-96.

53. Schuchat A, Lizano C, Broome C, Swaminathan B, Kim C, Winn K. Outbreak of neonatal listeriosis associated with mineral oil. Pediatr Infect Dis J 1991;10:183-9.

54. Hoffman TA, Ruiz CJ, Counts GW, Sachs JM, Nitzkin JL. Waterborne typhoid fever in Dade County, Florida. Clinical and therapeutic evaluation of 105 bacteremic patients. Am J Med 1975;59:481-7.

55. Klotz SA, Jorgensen JH, Buckwold FJ, Craven PC. Typhoid fever. An epidemic with remarkably few clinical signs and symptoms. Arch Intern Med 1984;144:533-7.

56. Mermin J, Townes J, Gerber M, Dolan N, Mintz E, Tauxe R. Typhoid fever in the United States,1985-1994. Arch Intern Med 1998;158:633-638.

57. Laboratory confirmed Salmonella surveillance. Annual Summary, 1997. Atlanta, Georgia: Centers for Disease Control and Prevention; 1999.

58. Cohen M, Tauxe R. Drug-resistant *Salmonella* in the United States: an epidemiologic perspective. Science 1986;234:964-9.

007759

59. Tauxe R. *Salmonella*: a postmodern pathogen. J Food Protect 1991;54:563-8.

60. DuPont HL. Shigella species. In: Mandell GL, Douglas RG, Bennett JE, editors. Principles and practice of infectious diseases. 3rd ed. New York: Churchill Livingstone; 1990: 1716-22.

61. Black RE, Craun GF, Blake PA. Epidemiology of common-source outbreaks of shigellosis in the United States, 1961-1975. Am J Epidemiol 1978;108:47-52.

62. Levine WC, Bennett RW, Choi Y, Henning KJ, Rager JR, Hendricks KA, et al. Staphylococcal food poisoning caused by imported canned mushrooms. J Infect Dis 1996;173:1263-7.

63. Holmberg S, Blake P. Staphylococcal food poisoning in the United States. JAMA 1984;251:487-9.

64. Mahon B, Mintz E, Greene K, Wells J, Tauxe R. Reported cholera in the United States, 1992-1994. JAMA 1996;276:307-12.

65. Shapiro RL, Altekruse S, Hutwagner L, Bishop R, Hammond R, Wilson S, et al. The role of Gulf Coast oysters harvested in warmer months in *Vibrio vulnificus* infections in the United States, 1988-1996. Vibrio Working Group. J Infect Dis 1998;178:752-9.

66. Hlady W, Klontz K. The epidemiology of *Vibrio* infections in Florida, 1981-1993. J Infect Dis 1996;173:1176-83.

67. Ostroff S. Yersinia as an emerging infection: epidemiologic aspects of Yersiniosis. Contributions to Microbiology & Immunology 1995;13:5-10.

68. Skeels MR, Sokolow R, Hubbard CV, Andrus JK, Baisch J. Cryptosporidium infection in Oregon public health clinic patients, 1985-88: the value of statewide laboratory surveillance. Am J Public Health 1990;80:305-8.

69. Roberts CL, Morin C, Addiss DG, Wahlquist SP, Mshar PA, Hadler JL. Factors influencing Cryptosporidium testing in Connecticut. J Clin Microbiol 1996;34:2292-3.

70. Petersen C. Cryptosporidium and the food supply. Lancet 1995;345:1128-9.

71. Djuretic T, Wall PG, Nichols G. General outbreaks of infectious intestinal disease associated with milk and dairy products in England and Wales: 1992 to 1996. Commun Dis Rep CDR Wkly 1997;7:R41-5.

72. Outbreaks of *Escherichia coli* O157:H7 infection and cryptosporidiosis associated with drinking unpasteurized apple cider--Connecticut and New

York, October 1996. MMWR 1997;46:4-8.

73. Petersen C. Cryptosporidiosis in patients infected with the human immunodeficiency virus [see comments]. Clin Infect Dis 1992;15:903-9.

74. Herwaldt BL, Ackers ML. An outbreak in 1996 of cyclosporiasis associated with imported raspberries. The Cyclospora Working Group [see comments]. N Engl J Med 1997;336:1548-56.

75. Herwaldt BL, Beach MJ. The return of *Cyclospora* in 1997: another outbreak of cyclosporiasis in North America associated with imported raspberries. Cyclospora Working Group [see comments]. Ann Intern Med 1999;130:210-20.

76. Addiss DG, Davis JP, Roberts JM, Mast EE. Epidemiology of giardiasis in Wisconsin: increasing incidence of reported cases and unexplained seasonal trends. Am J Trop Med Hyg 1992;47:13-9.

77. Birkhead G, Vogt RL. Epidemiologic surveillance for endemic *Giardia lamblia* infection in Vermont. The roles of waterborne and person-to-person transmission. Am J Epidemiol 1989;129:762-8.

78. Dennis DT, Smith RP, Welch JJ, Chute CG, Anderson B, Herndon JL, et al. Endemic giardiasis in New Hampshire: a case-control study of environmental risks. J Infect Dis 1993;167:1391-5.

79. Petersen LR, Cartter ML, Hadler JL. A food-borne outbreak of *Giardia lamblia*. J Infect Dis 1988;157:846-848.

80. Osterholm MT, Forfang JC, Ristinen TL, Dean AG, Washburn JW, Godes JR, et al. An outbreak of foodborne giardiasis. N Engl J Med 1981;304:24-8.

81. Guerina NG, Hsu HW, Meissner HC, Maguire JH, Lynfield R, Stechenberg B, et al. Neonatal serologic screening and early treatment for congenital *Toxoplasma gondii* infection. The New England Regional Toxoplasma Working Group [see comments]. N Engl J Med 1994;330:1858-63.

82. Wong SY, Remington JS. Toxoplasmosis in pregnancy [see comments]. Clin Infect Dis 1994;18:853-61.

83. Capo V, Despommier DD. Clinical aspects of infection with *Trichinella* spp. Clinical Microbiology Reviews 1996;9:47-54.

84. Tucker A, Haddix A, Bresee J, Holman R, Parashar U, Glass R. Cost-effectiveness analysis of a rotavirus immunization program for the United States. JAMA 1998;279:1371-76.

85. Rodriguez WJ, Kim HW, Brandt CD, Schwartz RH, Gardner MK, Jeffries B, et al. Longitudinal study of rotavirus infection and gastroenteritis in

families served by a pediatric medical practice: clinical and epidemiologic observations. Pediatr Infect Dis J 1987;6:170-6.

86. Gurwith M, Wenman W, Hinde D, Feltham S, Greenberg H. A prospective study of rotavirus infection in infants and young children. J Infect Dis 1981;144:218-24.

87. Parashar UD, Holman RC, Clarke MJ, Bresee JS, Glass RI. Hospitalizations associated with rotavirus diarrhea in the United States, 1993 through 1995: surveillance based on the new ICD-9-CM rotavirus-specific diagnostic code. J Infect Dis 1998;177:13-7.

88. Jin S, Kilgore PE, Holman RC, Clarke MJ, Gangarosa EJ, Glass RI. Trends in hospitalizations for diarrhea in United States children from 1979 through 1992: estimates of the morbidity associated with rotavirus. Pediatr Infect Dis J 1996;15:397-404.

89. Kilgore PE, Holman RC, Clarke MJ, Glass RI. Trends of diarrheal disease-associated mortality in US children, 1968 through 1991. JAMA 1995;274:1143-48.

90. Kapikian AZ, Chanock RM. Rotaviruses. In: Fields BN, DM DMK, Howley PM, et al, editors. Fields Virology. 3rd ed. Philadelphia: Lippincott-Raven; 1996: 1657-708.

91. Glass RI, Noel J, Mitchell D, Herrmann JE, Blacklow NR, Pickering LK, et al. The changing epidemiology of astrovirus-associated gastroenteritis: a review. Arch Virol - Suppl 1996;12:287-300.

92. Koopmans M, van Duynhoven Y, van de Heide R, et al. Molecular detection and epidemiology of Norwalk-like viruses and Sapporo-like viruses in the Netherlands. Presented at the International Workshop on Human Caliciviruses, Atlanta, Georgia, USA; 1999 Mar 29-31.

93. Grohman G. Viral diarrhoea in children in Australia. In: Tzipori S, et al, editors. Infectious diarrhoea of the young. New York: Elsevier Science Publishers; 1985.

94. Wolfaardt M, Taylor MB, Booysen HF, Englebrecht L, Grabow WOK, Jiang X. Incidence of human calicivirus and rotavirus infection in patients with gastroenteritis in South Africa. J Med Virol 1997;51:290-6.

95. Vial P, Kotloff KL, Tall BD, Morris JG, Levine MM. Detection by immune electron microscopy of 27-nm viral particles associated with community-acquired diarrhea in children. J Infect Dis 1989;161:571-3.

96. Donneli G, Ruggeri FM, Tinari A, Marziano ML, Menichella D, Caione D, et al. A three-year diagnostic and epidemiologic study on viral infantile diarrhoea in Rome. Epidemiol Infect 1988;100:311-20.

97. Riepenhoff-Talty M, Saif LJ, Barrett HJ, Suzuki H, Ogra PL. Potential spectrum of etiologic agents of viral enteritis in hospitalized patients. J Clin Microbiol 1983;17:352-6.

98. Suzuki H, Konno T, Kutsuzawa T, Imai A, Tazawa F, Ishida N, et al. The occurrence of calicivirus in infants with acute gastroenteritis. J Med Virol 1979;4:321-6.

99. Pang X, Joensuu J, Vesikari T. Human calicivirus-associated sporadic gastroenteritis in Finnish children less than 2 years of age followed prospectively during a rotavirus vaccine trial. Pediatr Infect Dis J 1999;18:420-6.

100. Mounts A, Holman R, Clarke M, Bresee J, Glass R. Trends in hospitalizations associated with gastroenteritis among adults in the United States, 1979-1995. Epi Infect . In press 1999.

101. Fankhauser RL NJ, Monroe SS, Ando T, Glass RI. Molecular epidemiology of "Norwalk-like viruses" in outbreaks of gastoenteritis in the United States. J Infect Dis 1998;178:1571-8.

102. Kaplan JE, Feldman R, Campbell DS, Lookabaugh C, Gary WG. The frequency of a Norwalk-like pattern of illness in outbreaks of acute gastroenteritis. Am J Pub Health 1982;72:1329-2.

103. Sekine S, Okada S, Hayashi Y. Prevalence of small round structured virus infections in acute gastroenteritis outbreaks in Tokyo. Microbiol Immunol 1989;33:207-17.

104. Viral Gastroenteritis Sub-Committee of the PHLS Virology Committee. Outbreaks of gastroenteritis associated with SRSVs. PHLS Microbiol Digest 1998;10:1-8.

105. Hepatitis surveillance report no. 56. Atlanta: U.S. Department of Health and Human Services, Public Health Service, CDC. 1996.

106. Bell BP, Shapiro CN, Alter MJ, Moyer LA, Judson FN, Mottram K, et al. The diverse patterns of hepatitis A epidemiology in the United States. Implications for vaccination strategies. J Infect Dis 1998;178:1579-84.

107. Hoofnagle JH, Carithers RL, Shapiro C, Ascher N. Fulminant hepatic failure. Summary of a workshop. Hepatology 1995;21:240-252.

Address for correspondence: Paul S. Mead, Division of Bacterial and Mycotic Diseases, Centers for Disease Control and Prevention, Mail Stop A38, 1600 Clifton Road, Atlanta, GA 30333, USA; fax: 404-639-2205; e-mail: pfm0@cdc.gov.

## Comments to the EID Editors

Please use this form to submit comments to the EID Editors.

Food-Related Illness and Death in the United States ">

```
Comments:
```

Email (optional)

[ ]

Submit | Reset

**Home | Top of Page | Current Issue | Expedited | Upcoming Issue | Past Issue | EID Search | Contact Us**

**CDC Home | Search | Health Topics A-Z**

This page last reviewed September 15, 1999

*Emerging Infectious Diseases* Journal
National Center for Infectious Diseases
Centers for Disease Control and Prevention

URL: http://www.cdc.gov/ncidod/eid/vol5no5/mead.htm



.

**EXHIBIT 4**

# Exhibit 4

chart139

# NUTRITION BUSINESS JOURNAL
**4452 PARK BLVD., SUITE 306  SAN DIEGO, CA 92116**
**P: 619.295.7685  F: 619.295.5743  www.nutritionbusiness.com**

## Top 104 U.S. Supplement Manufacturers in 2001

| | Manufacturer/Marketer | US Headquarters | | 2001 Wholesale Supp Revs |
|---|---|---|---|---|
| 1 | Royal Numico (Rexall, GNC) | Boca Raton | FL | 897 |
| 2 | Unilever (SlimFast) | W Palm Beach | FL | 499 |
| 3 | Wyeth (formerly AHP) | Madison | NJ | 488 |
| 4 | Leiner Health Products* | Carson | CA | 412 |
| 5 | NBTY | Bohemia | NY | 373 |
| 6 | Pharmavite* | San Fernando | CA | 352 |
| 7 | Metabolife International | San Diego | CA | 270 |
| 8 | Abbott Labs/Ross Products Division | Evansville | IN | 266 |
| 9 | Weider Nutrition Group | Salt Lake City | UT | 243 |
| 10 | Experimental & Applied Sciences (EAS) | Golden | CO | 215 |
| 11 | TwinLab Corporation | Ronkonkoma | NY | 192 |
| 12 | Enforma | | | 150 |
| 13 | Perrigo* | Allegan | MI | 150 |
| 14 | Chitosol (Vanson) | | | 140 |
| 15 | Bayer Corporation | Pittsburgh | PA | 126 |
| 16 | Natural Organics (Nature's Plus) | Melville | NY | 110 |
| 17 | Nutraceutical International | Park City | UT | 103 |
| 18 | Bristol Myers Squibb/Mead Johnson | Columbus | OH | 102 |
| 19 | Optimum Nutrition | Aurora | IL | 96 |
| 20 | Enzymatic Therapy | Green Bay | WI | 95 |
| 21 | Country Life | Hauppauge | NY | 90 |
| 22 | M Schwabe (Natures Way/B&T) | Springville | UT | 80 |
| 23 | Now Foods | Glendale Heights | IL | 77 |
| 24 | Inverness (acq IVC Industries*) | Portland | OR | 70 |
| 25 | Natrol | Chatsworth | CA | 70 |
| 26 | Metagenics/Healthcomm International | San Clemente | CA | 68 |
| 27 | HVL Inc. (Douglas Labs) | Pittsburgh | PA | 67 |
| 28 | Delavau* | Philadelphia | PA | 65 |
| 29 | Cytodyne | Lakewood | NJ | 63 |
| 30 | MuscleTech | | | 61 |
| 31 | Anabolic Labs (Vitamer)* | Irvine | CA | 60 |
| 32 | Garden State Nutrition (VitaQuest Intl.)* | West Caldwell | NJ | 55 |
| 33 | Standard Process | Palmyra | WI | 53 |
| 34 | AmeriFit | Bloomfield | CT | 50 |
| 35 | Pharmaton Natural Health Products | Ridgefield | CT | 50 |
| 36 | Vitatech International* | Tustin | CA | 45 |
| 37 | Integrative Therapeutics | Wilsonville | OR | 42 |
| 38 | Chattem (Sunsource) | Chattanooga | TN | 42 |
| 39 | Planetary Formulas/Threshold | Scotts Valley | CA | 40 |
| 40 | Natural Alternatives* | San Marcos | CA | 36 |
| 41 | Humco* | Texarkana | TX | 35 |
| 42 | Nature's Best | Hauppauge | NY | 33 |
| 43 | Atkins Nutritionals | New York | NY | 32 |
| 44 | Alacer | Foothill Ranch | CA | 32 |
| 45 | Nature's Life | Garden Grove | CA | 30 |
| 46 | MLO Products | Fairfield | CA | 29 |
| 47 | Jarrow Formulas | Los Angeles | CA | 26 |
| 48 | Nature's Answers | Hauppauge | NY | 25 |
| 49 | Champion Nutrition | Concord | CA | 24 |
| 50 | Bodyonics | Hicksville | NY | 23 |
| 51 | Standard Homeopathic | Los Angeles | CA | 23 |
| 52 | Quigley Corporation | Doylestown | PA | 23 |
| 53 | Natural Balance | Castle Rock | CO | 22 |
| 54 | AST Sports Science | Golden | CO | 21 |
| 55 | Universal Nutrition | New Brunswick | NJ | 21 |
| 56 | Omni Nutraceuticals (Irwin/4Health) | Boulder, | CO | 20 |

007767

chart139

| | Manufacturer/Marketer | US Headquarters | | 2001 Wholesale Supp Revs |
|---|---|---|---|---|
| 57 | Next Proteins International | Carlsbad | CA | 18 |
| 58 | Pure Encapsulations | | | 18 |
| 59 | Arkopharma/Health From the Sun | Waltham | MA | 18 |
| 60 | Naturade Inc. | Paramount | CA | 17 |
| 61 | Thorne Research | | | 15 |
| 62 | Smith Kline Beecham | Philadelphia | PA | 15 |
| 63 | M.D. Labs | Tempe | AZ | 14 |
| 64 | Boiron USA | Newtown Square | PA | 14 |
| 65 | Wakunaga of America | Mission Viejo | CA | 14 |
| 66 | Lichtwer Pharm US | Eatontown | NJ | 14 |
| 67 | SportPharma | Concord | CA | 12 |
| 68 | MD Labs | Tempe | AZ | 12 |
| 69 | Allergy Research Group | Hayward | CA | 12 |
| 70 | Naturally Vitamin, Inc. | Scottsdale | AZ | 12 |
| 71 | Rainbow Light Nutritional Systems | Santa Cruz | CA | 12 |
| 72 | Logic Nutrition | | | 11 |
| 73 | Celebrity Products Direct | Marina Del Rey | CA | 11 |
| 74 | Nutrition Now, Inc. | Vancouver | WA | 11 |
| 75 | Muscle Marketing USA | | | 10 |
| 76 | Maharishi Ayur-Ved Products Int'l, Inc. | Colorado Springs | CO | 10 |
| 77 | Crystal Star Herbal Nutrition | Earth City | MO | 10 |
| 78 | Natural ASA | Sandvika | NO | 10 |
| 79 | Botanicals International (Zand) | Boulder | CO | 10 |
| 80 | NX Nutritionals (Vermoax) | | | 10 |
| 81 | Novogen, Inc. | Stamfort | CT | 10 |
| 82 | Labrada Bodybuilding Nutrition | Houston | TX | 9 |
| 83 | National Enzyme Company | Forsyth | MO | 9 |
| 84 | Lane Labs | Allendale | NJ | 9 |
| 85 | Nutraceutix | | | 8 |
| 86 | Life Services Supplements, Inc. | Neptune | NJ | 8 |
| 87 | American Health Sciences | Tysons Corner | VA | 8 |
| 88 | Progressive Laboratories* | Irving | TX | 8 |
| 89 | Symbiotics | Sedona | AZ | 7 |
| 90 | Trace Minerals Research | West Haven | UT | 7 |
| 91 | Ocean Nutrition Canada Ltd | Bedford, Canada | NS | 7 |
| 92 | PacificHealth Laboratories Inc. | Woodridge | NJ | 6 |
| 93 | SciFit | | | 6 |
| 94 | Garden of Life | | | 6 |
| 95 | Bluebonnet Nutrition Corp. | Stafford | TX | 6 |
| 96 | Guycon | | | 6 |
| 97 | Metabolic Maintenance Products* | Sisters | OR | 6 |
| 98 | Medifast | | | 5 |
| 99 | Bricker Labs, Inc. | West Bend | WI | 5 |
| 100 | ISS Research | | | 5 |
| 101 | Metabolic Response Modifiers | Newport Beach | CA | 5 |
| 102 | Windmill Consumer | | | 5 |
| 103 | Olympian Labs | Scottsdale | AZ | 5 |
| 104 | Max Muscle | | | 2 |

Revenues listed are wholesale for supplements only (including contract mfg.) not entire company and not including raw material and MLM firms. Some revenues are estimates that have been compiled through information provided by company executives, industry analysts and reputable published materials. Although NBJ made every effort to be accurate, revenue figures are not the result of audits and therefore are not guaranteed to be accurate. Errors and omissions are unintentional

*Companies with a substantial portion of revenues from contract manufacturing supplements for other companies or private labeling

| Supplement Mfg/Mktg Cos. | total # of Cos. | $M Revs | % of market |
|---|---|---|---|
| Greater than $100M | 18 | 4,795 | 58% |
| $20M - $99M | 54 | 2,064 | 25% |
| less than $20M | 854 | 1,341 | 16% |
| | 926 | 8,201 | 100% |

In the company universe table depicting wholesale sales, company revenues for contract manufacturing were subtracted to avoid double counting

Copyright 2002 Penton Media Inc  May not be reproduced without permission from Nutrition Business Journal, www.nutritionbusiness.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
**ALLIANCE FOR NATURAL HEALTH U.S.,**         )
**et al.,**                                   )
                                              )
                                              )   **Case No. 1:09-cv-01523-CKK**
                                              )
                     *Plaintiffs*,            )
          v.                                  )
                                              )
**KATHLEEN SEBELIUS, et al.,**                )
                                              )
                     *Defendants*.            )
_____)


**Comments of Durk Pearson & Sandy Shaw and Exhibits l/a, l/b, l/c**

**AR 8570-8844**

Before the

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration

Rockville, MD

In re: Current Good Manufacturing )

Practice in Manufacturing, )

Packaging, or Holding ) Docket No. 96N-0417

Dietary Ingredients and )

Dietary Supplements )

## COMMENTS OF DURK PEARSON & SANDY SHAW

Durk Pearson & Sandy Shaw (Commenters) hereby submit their comments in response to the proposed rule in the above-referenced docket, 68 Fed. Reg. 12158 (March 13, 2003) (hereinafter the "Proposed Rule"). Pearson & Shaw design dietary supplements and health foods, and license these formulas to carefully selected vendors and manufacturers. Commenters would be adversely affected by the Proposed Rule since it would substantially raise production costs and product sale prices, significantly reduce customer demand for dietary supplements, and has already reduced the number of manufacturers and sellers of their licensed formulations.

### Durk Pearson & Sandy Shaw
### Quality Control Experience

Durk Pearson has patents in the area of oil shale recovery, lasers, holography, and foods. He worked on manned aerospace programs from Gemini to the Shuttle and won numerous awards, including an award (attached as Exhibit 1) from the International Society for Testing and Failure Analysis (a professional organization) for his penetrating quality control and safety analyses. (In aerospace, quality control is a matter of life and death.) He wrote much of the safety manual for the Materials

96N-0417

1

C 231

Processing Laboratory on the Shuttle.  He had principle responsibility for determining whether prospective bidders on solid rocket engine carbon composite throat packages for our strategic nuclear missile deterrent had production and quality assurance systems in place adequate to assure reliable operation of these ICBMs.  Each bidder that qualified had its own systems and procedures; there were no ICBM rocket engine throat CGMPs. (The throat of a solid fuel rocket engine is the most highly stressed and most difficult to design and manufacture component, and the part most likely to catastrophically fail.)  Durk took a triple major at MIT in physics, biology, and psychology, with a triple minor in electrical engineering, computer science, and chemistry, graduating from MIT in 1965 with a degree in physics.

Sandy Shaw has a patent in foods.  She received her degree from UCLA in chemistry in 1966 after taking a double major in chemistry and zoology and a minor in mathematics.  Her work in the food industry has included supervision of quality control of all food production at a major canned food company.  In the late 1960s, she designed and implemented the first computerized quality control system to be used at the company, doing all the computer programming herself.


The Commenters include by reference the CGMP Economic Impact Assessment by Paul H. Rubin (hereinafter the Rubin Report, the Rubin Economic Analysis or the Rubin Economic Impact Assessment) that was included with the joint Comments of Essential Nutrition, Ltd.; Life Enhancement Products, Inc.; Durk Pearson and Sandy Shaw; Julian M. Whitaker, M.D.; Advocare International, L.P.; Vitamin Research Products; and American Nutrition Corporation represented by Jonathan W. Emord, Claudia A. Lewis-Eng, Andrea G. Ferrenz, Kathryn E. Balmford, and Jonathan R. Goodman.

In addition to the comments we have written here, we also include all those comments that are written directly upon the enclosed pages of our copy of the FDA's Proposed Rule, adjacent

2

008571

to the portions of the Proposed Rule to which the comments pertain.

## Protecting the Public Health and Safety

The FDA's mission is to protect the public health and safety. The products that are actually brought to market are the instrument by which the public's health and safety may be affected and, hence, are the proper object of the FDA's attention.

The products, not the factories, are in interstate commerce. Whether, as required under the proposed cGMPs, a particular piece of paper is or is not filed should not be considered evidence of adulteration or misbranding, as the FDA proposes, but of the failure to file a piece of paper. The products themselves entail all the necessary evidence of whether there is any adulteration or misbranding, such as by not including the ingredients stated on the label (misbranding), by not including the amounts of the ingredients as stated on the label (misbranding), or by including something that is dangerous to the public when used as recommended on the label (adulterated). Misbranding and adulteration are already illegal, and FDA already has all legal authority needed to seize such products and to punish those responsible. For further substantiation of this approach -- looking at the actual standards met by the products themselves, rather than providing elaborate rules and regulations for the factories that made them -- see Rubin's analysis of "design standards" vs. "performance standards" in his Economic Impact Assessment, pp. 17-18.

## We Do Not Trust the FDA to Respect Our Constitutional Rights

We are two scientists who earn much of our living by designing dietary supplements that we license to various

3

008572

companies that meet our standards. We have had to spend large sums of our own money along with others who have also had to spend considerable amounts of money to fight the FDA in the courts for violating our First Amendment rights to include truthful, nonmisleading scientific information about dietary supplements on their labels and in labeling. The Courts repeatedly agreed with us that the FDA was violating (even wilfully violating) our First Amendment rights.

From the time (1994) that we filed a First Amendment suit to require FDA to allow a scientifically valid omega-3 DHA/EPA cardiovascular disease health claim to the time that FDA finally obeyed the orders of the courts (2001), approximately 1,000,000 Americans died premature deaths that could have been prevented by use of this supplement.

Hence, you may not wonder that we are concerned with the imposition of a system (as described in the Proposed Rule) that allows for immense and arbitrary discretion on the part of FDA inspectors.

An example of FDA's Proposed Rule is that consultants must be qualified by training and experience to advise on his or her subject area. This, as many other of the rules, is obvious. However, the problem is that somehow we and the FDA may have different opinions on whether a consultant we hire is qualified by training or experience. If our products are not misbranded or adulterated, why should we have to share the FDA's opinion of our consultant? Yet, the FDA can brand our products adulterated if a consultant of whom they disapprove was associated with its manufacture or design, **regardless of whether there is in fact any product defect.**

There is special danger in this Proposed Rule for those small companies, including the two of us, who have supported suits against the FDA on the basis of FDA's violation of their First Amendment rights, as affirmed again and again by the

4

008573

courts. The 547 pages of rules and regulations set the stage for FDA agents to easily focus their attention on companies such as these, checking the myriad rules to find something they can use to punish them, such as an allegedly missing paper, or any aspect of factory design they can claim should have been done differently (such as "your washroom is too far from or too near to the mixer"). The Proposed Rule is peppered with many undefined terms (such as "adequate," "sufficient", and "qualified"); without definitions, it will always be possible for an FDA inspector to assert that something is not adequate, sufficient, or qualified.

It is because the FDA has been unwilling to enforce the existing laws **that already prohibit misbranded or adulterated products** that this new scheme is hatched that adds a large new expensive and burdensome body of regulations to those the FDA has failed to enforce.  We ask the FDA: why doesn't the agency consistently enforce the existing laws against misbranded and adulterated products?  With that failure as a record, why should we believe that the FDA, having a huge new body of regulations added to the ones it hasn't enforced, will now (somehow) enforce the law against misbranded and adulterated products?  From Rubin's Report, it is clear that the costs of these new rules and regulations are far, far greater than the benefits.

### The Proposed Rule Includes FDA Fraud on the Public

Furthermore, the FDA proposes to legalize their right to commit fraud on both consumers and companies by publicly branding a product as "adulterated" even if it is not defective in any way, and contains exactly what it is labeled as containing.  The public understands "adulterated" as meaning diluted (subpotent) or contaminated with harmful substances, such as rat feces or poison.  999,999 persons out of a million will <u>not</u> understand that an "adulterated" product can be faultless, but that the bureaucratic procedure is allegedly missing some obscure and

008574

unnecessary piece of paper. The government does not have the right to commit willful fraud! Moreover, the primary principle of American justice is that a person or entity is considered innocent until proven guilty, and in DSHEA Congress expressly created a statutory presumption of safety. The FDA, however, brands somebody's product as adulterated or misbranded (having a defect as noted above) <u>regardless of whether it actually has such a defect</u> because of the failure of the manufacturer to (for example) file a certain paper for the FDA inspectors.

Not only is such a system of presumed guilt an unjust and unconstitutional one (and in violation of DSHEA), it gives the FDA immense powers to seize products that are in fact perfectly legal and to punish manufacturers who made those perfectly legal products but, because of a missing paper, are subject to FDA punishment. Is this the way to protect the public health? This proposal effectively controls every aspect of factory activity, establishing a regime that is easily abused, with huge costs but little benefit, while destroying our liberty interests in productive enterprise -- over the innovative dietary supplement industry as well as over the free choice of consumers who wish to buy from it.

As we note above, the protection of the public health requires that FDA regulate actual products that enter into interstate commerce. We do not see why the FDA should design plants, quality control systems and computer systems. <u>The FDA is unwilling to enforce current law to remove adulterated or misbranded products from the market, yet we are to believe that this qualifies the agency to exercise broad new powers to regulate nearly everything to do with the production of products and that they will not only enforce all this but that there will be improved health and safety without inordinate costs!</u> We do not trust the FDA with these broad new powers.

6

## Certificates of Analysis

The FDA has made it clear that dietary supplement companies cannot rely on the certificate of analysis on an incoming ingredient regardless of how reputable the manufacturer (e.g. Roche Vitamins, Ajinomoto, Tanabe) is or how long it has been in business without problems with its ingredients (e.g. Roche Vitamins, Ajinomoto, Tanabe). This is a <u>disincentive</u> for dietary supplement companies to pay the premium prices that are usually charged for dietary ingredients by the most reputable companies. Rather than pay a premium price for the ingredient and then have to pay the additional costs for testing, many companies will likely choose to buy cheapo dietary supplement ingredients such as those from unidentified manufacturers in China which will probably pass all the necessary tests but are still more likely to contain contaminants undetected by tests than those from the highly reputable firms. A good example is the contaminated L-tryptophan from Showa Denko; there were no such toxic contaminants in the tryptophan manufactured by Ajinomoto or Tanabe.

Showa Denko became a dominant source of l-tryptophan because they charged significantly less for their l-tryptophan. Their contaminated l-tryptophan met USP analytical standards (the contaminant was present at parts per million levels) and would not have been either prevented or detected by the CGMPs proposed by the FDA. To this day, FDA claims that they do not know the chemical identity of the contaminant or contaminants, which is the sole basis for FDA's continuing prohibition on tryptophan importation. The toxin or toxins was an order of magnitude more toxic than VX nerve gas, the most potent of those that have been weaponized. One cannot test for an unknown toxin at these very low levels.

We suggest, therefore, that the FDA allow reliance upon

008576

certificates of analysis on products from reputable firms such as Roche Vitamins, Ajinomoto, and Tanabe to provide authoritative analytical information on incoming ingredients in place of redundant, money-wasting extra testing that is likely to drive many companies to save money by using cheaper, potentially less safe, ingredients.  Do you (the FDA) really believe that you can enforce effective CGMPs in a Communist dictatorship like China?

## The Proposed Rule Is Not Modeled After Food CGMPs

FDA cites (pg. 44) their legal authority for the Proposed Rule.  Section 402(g) of the Public Health Service Act gives the FDA explicit authority to issue a rule regulating conditions for manufacturing, packaging, and holding dietary supplements. Section 402(g)(2) of the act states that any such regulations "shall be modeled after current good manufacturing practice regulations for food and may not impose standards for which there is no current and generally available analytical methodology." However, as we explain below, there is extensive evidence within the Proposed Rule that the CGMPs proposed are drug-like rather than food-like.

First, FDA argues (pg. 45) that when Congress used the term "modeled after" Congress intended that [the FDA] use the food CGMPs as a "preliminary pattern" for the dietary supplement CGMPs.  Regardless whether "preliminary pattern" is really what Congress meant by "modeled after," it is clear that Congress did NOT intend that the CGMPs for dietary supplements be modeled after drug CGMPs.  The FDA notes that if Congress had intended for the agency to adopt food CGMPs as the CGMPs for dietary supplements, they could have explicitly stated that.  Instead, Congress specified that the dietary supplement CGMPs be "modeled after" food CGMPs, allowing for some modification.  It is unlikely, however, that Congress would have specified that dietary supplement CGMPs be "modeled after" those for foods if they wished those for dietary supplements to be more onerous than

8

those for foods and, clearly, dietary supplement CGMPs were not to be modeled after drug CGMPs.

On page 46, FDA states that "dietary supplements can be considered as falling somewhere along the continuum between conventional food on the one hand and drugs on the other." <u>The Dietary Supplement Health and Education Act, however, made it clear that dietary supplements were to be considered and regulated as food.</u>

FDA pursues this drug analysis (pp. 46-47) by claiming that dietary supplements, unlike conventional food, contain ingredients that are consumed in very small quantities. That is not true. <u>Spices and flavoring herbs are frequently used in foods in very small quantities, as are fortification vitamins (such as folic acid and niacin in flour and vitamin D in milk).</u>

FDA then claims that dietary supplements, unlike conventional foods, may be intended to have a specific physiological response. However, conventional foods are full of ingredients that have specific physiological effects (there would be no point in eating, if they didn't). For example, the choline in eggs and soybeans is a precursor to the neurotransmitter acetylcholine required for memory and focus, as well as muscular contraction. The omega-3 fatty acids in fish have important anti-inflammatory, anti-abnormal clotting, and anti-arrhythmic effects. The American Heart Association's Step 1 and Step 2 diets have been designed to have specific beneficial physiological and biochemical effects (such as lowering LDL cholesterol) on patients with extant cardiovascular disease.

On pg. 51, the FDA states that: "We note that certain terms Congress used in section 402(g)(2) of the act, i.e., 'standards' and 'current and generally available analytical methodology' show that Congress intended to give us the authority to establish regulations in this rule that do not have parallel provisions in other food CGMPs." Expressions such as "standards" and "current

9

008578

and generally available analytical methodology" apply to food science, so we do not see how these terms give FDA any authority to go beyond modeling their CGMPs after those of food.

On pg. 67, FDA notes that dietary supplement companies are not permitted, under the Proposed Rule, to use a supplier's certification even though food companies can.  On pg. 71, FDA notes that food CGMPs do not have recordkeeping requirements, but that the FDA doesn't see that this prevents them from imposing that upon dietary supplements, as they do with drugs.  This, however, is not modeled after food CGMPs.  The FDA explains that many dietary supplements contain pharmacologically active substances.  However, so do foods.  They further explain that some dietary supplements may contain potential allergens. However, so do far more foods.

On pg. 244, the FDA commands:  **"Quarantine** packaging and labels until your quality control unit tests or examines a representative sample to determine that specifications are met." (emphasis added) This is just one example in the Proposed Rule where FDA uses the same language, nearly word for word, as in the drug CGMPs.  The FDA didn't merely model these CGMPs after the drug CGMPs, they copied much of the drug CGMPs.

On page 330, the FDA makes estimates of recordkeeping expense burden "based on our institutional experience with CGMP requirements for drugs."  On pg. 414, the FDA notes that they "used a study of a medical device CGMP regulation to estimate the costs of recordkeeping." Why would the FDA use their experience with drug CGMPs and a study of medical device CGMP regulation to estimate the costs of recordkeeping in a CGMP modeled after food? Because the CGMP in the Proposed Rule is not modeled after food.

## Compounding Pharmacists and the Need for CGMPs

Compounding pharmacists are small-scale manufacturers of

10

008579

drugs who are not required to follow the drug CGMPs and who make
compounds that, if there is too much or too little of certain
ingredients, or the wrong ingredients, can result in serious
illness or even death.   While compounding pharmacists work with
potentially toxic materials in their practice, they have an
excellent health and safety record, probably better than that of
large companies that follow drug CGMPs.   This seriously brings
into question the idea that drug CGMPs and the huge costs they
impose on companies (and the much higher prices for drug products
that result) is actually improving the public health and safety.

Moreover, compounding pharmacists, since they are not
required to follow drug CGMPs are very unlikely to be required to
follow dietary supplement CGMPs.   Hence, we will likely see
compounding pharmacists making individualized dietary supplements
without being subject to CGMPs in the Proposed Rule.   This
parallel system, wherein some small manufacturers have to follow
CGMPs and others do not, brings into question the requirement for
FDA's CGMPs to protect the public health and safety.

### The Proposed Rule Does Not Meet the Requirements of
### Executive Order 12866

Executive Order 12866 (originally issued by President
Clinton) says agencies can "adopt a regulation only upon a
reasoned determination that the benefits of the intended
regulation justify its costs."   The Rubin CGMP Economic Impact
Assessment finds upon analysis of the Proposed Rule that
"benefits are no more than $13.9 million and costs are at least
$860 million."   The alleged - not proven - benefits cannot
justify the 61 times greater costs.

We suggest that the FDA consider mandating performance
standards, rather than design standards. As explained in Paul H.
Rubin's CGMP Economic Impact Assessment (pp. 17-18): "Design
standards mandate the actual procedure a regulated entity must

11

follow to meet the regulation.  Performance standards mandate the outcome, but allow the firm to choose the method for achieving the outcome.   It is generally agreed that where possible performance standards are preferable since they allow the regulated firm more discretionary authority to achieve the desired outcome at lower cost.   The standards in the Proposed Rule (and all alternatives considered on pp. 12221-12223) are strictly design standards: they mandate actual procedures that must be followed."

"The FDA would do well to consider restructuring its mandate in terms of performance standards, such as no more than a specified level of contamination.  Of course, given the low level of harm identified in the industry, it is highly likely that it would already satisfy any reasonable set of performance standards indicating that regulation would serve no useful purpose."   If the FDA is bound and determined that it must impose a regulatory regime upon the industry, despite the industry's low level of harm (when compared to foods in common form, to say nothing of drugs), then please do the least collateral damage to the industry and to consumers buying its currently remarkably safe and relatively inexpensive products by mandating performance standards, not design standards.

Is it because the FDA is unable to define the desired outcome that FDA is, instead, attempting to mandate in its place a series of step by step instructions that achieve very small benefits for very great costs?

### Specific Comments On FDA's Table 8
### (pp. 375-376)

This summary of health effects associated with dietary supplement recalls from 1990-1999 does not support FDA's demand for CGMPs; on the contrary, it suggests that a vastly smaller and less expensive suite of tests would prevent all alleged harms

12

008581

that could have been prevented by FDA's drug-like CGMPs.

**Hypervitaminosis A:** The health cost per event of $936 suggests that this did not cause serious harm. Even this small harm could have been prevented merely by analyzing the finished product for vitamin A content. Very Expensive CGMPs are not needed.

**Hypervitaminosis D:** The health cost per event of $1,022 suggests that this did not cause serious harm. Even this small harm could have been prevented merely by analyzing the finished product for vitamin D content. Very Expensive CGMPs are not needed.

**Hypervitaminosis B-6:** The health cost per event of $8,868 suggests that this did not cause serious harm. Even this small harm could have been prevented merely by analyzing the finished product for vitamin B-6 content. Very Expensive CGMPs are not needed.

**Hypervitaminosis B-3:** The health cost per event of $4,258 suggests that this did not cause serious harm. Indeed, the average healthy adult can safely consume 800 mg. niacin per day without harm (though with potentially alarming brief flushing and pruritis.) (A single capsule of this product made it very clear to the customer that the product was defective; there was no opportunity for liver damage to occur.) Even this small harm could have been prevented merely by analyzing the finished product for vitamin niacin content. Very Expensive CGMPs are not needed.

**Hypermineralosis Zn:** The health cost per event of $4,228 suggests that this did not cause serious harm. Even this small harm could have been prevented merely by analyzing the finished product for zinc content. Very Expensive CGMPs are not needed.

**Hypermineralosis Cu:** The health cost per event of $369

13

008582

suggests that this did not cause serious harm.   Even this small harm could have been prevented merely by analyzing the finished product for copper content.   Very Expensive CGMPs are not needed.

**Hypermineralosis Fe:**   The health cost per event of $374 suggests that this did not cause serious harm.   Even this small harm could have been prevented merely by analyzing the finished product for iron content.   Very Expensive CGMPs are not needed.

**Hypermineralosis F:**   The health cost per event of $938 suggests that this did not cause serious harm.   Even this small harm could have been prevented merely by analyzing the finished product for fluoride content.   Very Expensive CGMPs are not needed.

**Hypermineralosis Se:**   The vastly excessive selenium caused death, which is certainly serious harm.   This great harm could have been prevented merely by analyzing the finished product for selenium content.   Very Expensive CGMPs are not needed.

**The above eleven recalls and the harms associated with them could have been entirely prevented by simple and relatively inexpensive quantitative analysis of the finished products for all ingredients that have the potential for significant harm if the capsule or pill is comprised entirely of that ingredient. Very expensive CGMPs are not needed to prevent these types of harms.**

**Salmonella and Klebsiella** pneumonia are <u>not</u> problems in most dietary supplements, though <u>aqueous</u> <u>herbal</u> <u>extracts</u> <u>and</u> <u>other</u> <u>non-dry</u> <u>products</u> are subject to bacterial contamination, <u>just</u> <u>like</u> <u>foods</u>.   **The requirement for food CGMPs (such as bacteriological testing of the finished products) for these types of products would have prevented these harms.   Very expensive drug-like CGMPs are not needed.**

008583

**Glass fragments** in products **can be prevented by use of appropriate food CGMPs whenever glass is present.  Very expensive drug-like CGMPs are not needed.**


**Yellow #5 (undeclared), Yellow #6 (undeclared), Red #40 (undeclared), Blue #2 (undeclared), lactose (undeclared), sulfites (undeclared), and ephedra (undeclared):** What do these incidents all have in common?  **The harms were caused by the fact that ingredients were not declared, a practice that is <u>already illegal</u> as both <u>misbranding</u> <u>and</u> <u>adulteration</u>.**  These ingredients were <u>purposely</u> added and not listed on the labels.  **Very expensive drug-like CGMPs are not needed; FDA should simply enforce existing laws against misbranding and adulteration.**


**Digitalis:** The medical plant containing digitalis contaminated the herb plantain, with deadly results.  Since the supplement manufacturers received the plantain in powdered form, the contamination could not be detected by visual or microscopic inspection, even by a "properly trained plant taxonomist."  **It is economically unfeasible to test every batch of herbs for the thousands of known plant toxins (at about $200 per test for each toxin.)**  Drug-like CGMPs at the plant material provider would arguably have reduced the risk of this contamination, but since the provider was almost certainly located in China, Korea, Russia, or some other second or third world foreign country, it is very unlikely that FDA's CGMPs could have been enforced there. **We find it very interesting to note that according to our medical journal accounts of this incident, FDA knew that over 100 supplement manufacturers were using this contaminated batch of plantain, but apparently did not bother to contact most of them!** Gross dereliction of duty by some FDA personnel may be a dangerous problem that will not be corrected by imposing CGMPs on the supplement industry.  **Very expensive drug-like CGMPs at the supplement manufacturers would not have prevented this incident,**

15

008584

**and very expensive drug-like CGMPs could not have been verifiably imposed on a foreign herb vendor.**

**Eosinophilia-myalgia syndrome:** As the U.S. Centers for Disease Control has emphatically stated, the EMS epidemic was caused by contaminated tryptophan produced by one foreign ingredient manufacturer (Showa Denko). To this day, FDA prohibits any importation of tryptophan from any manufacturer (including Ajinomoto and Tanabe, whose tryptophan was never contaminated), on the basis that the toxic contaminants have never been identified. Tryptophan is not manufactured domestically. (These contaminants were ultratoxins; they were present at parts per million levels and were more toxic than VX nerve gas. The contaminated tryptophan met USP standards for purity.) **Since the toxic contaminants were unknown at the time of the incident, and were of unprecedented toxicity, neither FDA's proposed CGMPs at the manufacturer nor CGMPs at the dietary supplement manufacturers who used the contaminated tryptophan could have prevented this tragedy, hence as Dr. Paul Rubin said, this incident can not legitimately be used to justify the imposition of CGMPs.** No contaminated tryptophan was used by any of our licensees in manufacturing our tryptophan containing formulations; we permitted only Ajinomoto and Tanabe tryptophan to be used, because of their very extensive experience and long history of safely manufacturing this substance -- which, in our opinion, is much more important than FDA's proposed CGMPs.

16

008585



INTERNATIONAL SOCIETY

FOR TESTING

AND

FAILURE ANALYSIS

HONORS

## DURK PEARSON

AN AMERICAN RENAISSANCE MAN
OF SCIENCE
WHOSE POSITIVE ACHIEVEMENTS HAVE
EXTENDED BEYOND THE LABORATORY
TO SOCIETY IN GENERAL

PRESENTED OCTOBER 28, 1980

LOS ANGELES, CA.

DMB

Display Date _3—7—03 @ 11:30 am_
Publication Date _3—13—03_
Certifier _N. Hawkins_

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration

21 CFR Parts 111 and 112

[Docket No. 96N-0417]

RIN 0910-AB88

Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements

AGENCY:  Food and Drug Administration, HHS.

ACTION:  Proposed rule.

SUMMARY:  The Food and Drug Administration (FDA) is proposing current good manufacturing practice (CGMP) regulations for dietary ingredients and dietary supplements. The proposed rule would establish the minimum CGMPs necessary to ensure that, if you engage in activities related to manufacturing, packaging, or holding dietary ingredients or dietary supplements, you do so in a manner that will not adulterate and misbrand such dietary ingredients or dietary supplements. The provisions would require manufacturers to evaluate the identity, purity, quality, strength, and composition of their dietary ingredients and dietary supplements. The proposed rule is one of many actions related to dietary supplements that we (FDA) are taking to promote and protect the public health.

FALSE

DATES:  Submit written comments by [insert date 90 days after date of publication in the FEDERAL REGISTER]. Submit written

cf97107

96N-0417

NPR1

008587

15

for public comment on both the activities we should undertake as part of an overall strategy and the prioritization of those activities.   In the notices for these meetings, we identified the development of CGMPs for dietary supplements as one activity that should be considered in an overall strategy.

During and after the strategic meetings, we received comments from consumers, consumer advocacy groups, health care professionals, health care professional organizations, industry, and industry trade associations.   The comments addressed a wide range of activities related to regulating dietary supplements. (These comments can be seen at our Dockets Management Branch (see ADDRESSES) in docket number 99N-1174.)   The comments generally   *REALLY?* identified the development of CGMP regulations as a high priority activity that should be included in any FDA strategic plan for regulating dietary supplements.   Some comments that addressed the development of CGMPs are summarized as follows:

- *BIG*   It would be useful to industry to have FDA establish CGMPs especially for small and intermediate-size firms *WHAT EVIDENCE?* that are not clear on what they should be doing;

- CGMPs would establish a level playing field for industry, which would help prevent irresponsible firms from making and selling adulterated products;   *ALREADY ILLEGAL*

- CGMPs should be able to accommodate a wide variety of firms, that is, small and large firms that manufacture

16

a wide array of different types of products and
ingredients;

- CGMPs should ensure that consumers get dietary
  supplements with the strength and the purity that
  consumers expect;                                    *MISBRANDING ALREADY ILLEGAL*

- CGMPs should ensure that every dietary supplement on
  the market has the safety, identity, purity, quality,
  and strength it purports in the label to possess;

- CGMPs should include ingredient identity testing and
  other testing;                                       *DUPLICATES ANALYSIS ALREADY DONE BY REPUTABLE INGREDIENT MANUFACTURERS*

- CGMPs should ensure that dietary supplements are
  produced using a master formula procedure and produced
  in a sanitary facility;

- CGMPs should require that manufacturers have documented
  evidence that their manufacturing process is under
  control on a consistent basis;

- CGMPs should require manufacturers to test dietary
  ingredients, particularly imported botanicals, for
  heavy metals, pesticides, and industrial contaminants;   *REASONABLE FOR IMPORTED BOTANICALS*

- CGMPs should require expiration dating and testing for
  dissolution and bioequivalence;                      *DRUG CGMP*

- CGMPs should require that companies report adverse
  reactions; and

-17-

CGMPs should include guidance on testing for ingredient

identity and adulteration with toxic substances. *WHICH CANNOT ALWAYS BE DETECTED ESPECIALLY WHEN YOU DON'T KNOW WHAT TO TEST FOR*

2.   Small Business Outreach Meetings

We held public meetings on July 12, September 28, and

October 21, 1999, to collect information from industry and others

that would help us to understand the economic impact on small

businesses of CGMP regulations for dietary supplements.

Transcripts of these public meetings (docket number 96N-0417, *eg.*

"Development of Strategy for Dietary Supplements") are available *CONTAMIN-ANTS IN*

at our Dockets Management Branch or electronically at *SHOUA*

http://www.fda.gov/ohrms/dockets/dockets/96n0417/tr00001.pdf. *JENKO L-TRYPTOPHAN.*

Public comments from small businesses included both support of

and concern for CGMP regulations.  Small businesses expressed

concerns about the cost and the time involved in complying with

any rule that contains the following requirements:

- Conducting tests to determine identity, purity,
  quality, strength, and composition of dietary
  ingredients and dietary supplements;

- Maintaining written procedures and records documenting
  that procedures are followed; and

- Providing data that support expiration dating.

Public comments from small business expressed support for dietary

supplement CGMP regulation.  Some small businesses (1 with 15

employees) commented that they have CGMPs in place with written

008590

22

compared to larger firms and the rationale for doing so.
Finally, comments should address the agency's legal authority to
issue these regulations.

In deciding whether to propose CGMP regulations for dietary
supplements, we asked ourselves:

- Why are CGMP regulations needed?

- How will CGMP regulations take into account technical
  feasibility? and

- How can FDA help industry achieve compliance with
  CGMPs?

1. Why Are CGMPs Needed?

CGMP regulations for dietary ingredients and dietary
supplements are necessary to promote and protect the public
health. In addition, CGMP regulations would benefit consumers
economically and would benefit industry. *NOT TRUE, SEE RUBIN'S CGMP ECONOMIC IMPACT ASSESSMENT.*

a. CGMPs help protect the public health. The dietary
supplement industry is one of the fastest growing product areas
that FDA regulates. In 1999, Prevention magazine conducted a
survey entitled "Consumer Use of Dietary Supplements" (Ref. 5).
The survey used data from telephone interviews with a nationally-
representative sample of 2,000 adults living in households with
telephones in the continental United States. The telephone
interviews were done in April and May, 1999. Using population
estimates based on the Census Bureau's March 1998 Current

23

Population Survey Estimates, the survey stated that approximately
186,014,712 adults live in the households with telephones in the
United States and that an estimated 158.1 million of these
Americans in households with telephones use dietary supplement
products.   These consumers spend approximately $8.5 billion a
year on dietary supplements.   The survey also found that:

- Only 41 percent of the surveyed consumers who use
  vitamins and minerals think they are very safe and only
  50 percent think they are somewhat safe;

- Only 24 percent of the surveyed consumers who use
  herbal products think they are very safe; and only 53
  percent think they are somewhat safe; and

- Twelve percent of the surveyed consumers who have used
  dietary supplements say they have experienced side
  effects or adverse reactions from their use of dietary
  supplements.

The survey also found strong public support for increased
Government regulation of dietary supplements; 74 percent of the
surveyed consumers reported that they think that the Government
should be more involved in ensuring that these products are safe
and do what they claim to do.

However, unlike other major product areas, there are no FDA
regulations that are specific to dietary ingredients and dietary
supplements that establish a minimum standard of practice for

*[handwritten annotations:]* HOWEVER, THERE IS NO INDICATION GIVEN HERE OF THE TRADEOFFS THE PUBLIC WOULD ACCEPT IN EXCHANGE FOR THE GOVERNMENT REGULATION; e.g. WOULD THE PUBLIC PAY AND BE WILLING TO PAY EXTRA AND HOW MUCH WOULD THEY BE WILLING TO PAY FOR MORE EXPENSIVE SUPPLEMENTS

008592

of the dietary supplement products used by this woman
(Ref. 6).  A nationwide listing of manufacturers
indicated that 183 firms may have used the contaminated
dietary ingredient in dietary supplements.  The
proposed CGMP regulations, had they been in effect,
would have required identity and purity tests of *THESE ARE NEEDED BOTA FOR — NOT FOR ASCORBIK ACID FROM ROCHE VITAMINS*
dietary ingredients and dietary supplements and would
likely have prevented the use of the D. lanata in these
dietary supplements.

• In 1998, the American Herbal Products Association
(AHPA) surveyed its members about commonly adulterated
botanicals and methods useful in detecting adulteration
in botanicals (Ref. 11).  AHPA members identified 43
botanicals, including D. lanata contaminated plantain,
that are commonly adulterated with contaminants, the
common adulterant for each botanical, and a method for
identifying the adulterant.  For example, aflatoxin and
mycotoxin (toxic compounds produced by certain molds)
are known to contaminate certain herbal and botanical
dietary supplements (Refs. 11 through 14).  Under this
proposed rule, a manufacturer would have to establish
specifications for botanicals that may contain toxic
compounds and conduct testing to ensure that there are

26

not toxic compounds present that may adulterate the
dietary ingredient or dietary supplement.
We have found manufacturers using nonfood-grade
chemicals to manufacture dietary supplements (Ref. 15).
The proposed rule would require that manufacturers
establish specifications for components used in
manufacturing and also would require manufacturers to
establish and follow laboratory control procedures that
include criteria for establishing appropriate
specifications. The proposal would further require
manufacturers to conduct testing to confirm that their
specifications are met. These requirements, if
finalized, would ensure that manufacturers establish
and use appropriate criteria, such as using food-grade
rather than industrial-grade chemicals, and would
ensure that manufacturers conduct testing to confirm
that food-grade chemicals were received from the
supplier. *SHOWA DENKO TRYPTOPHAN WAS ~~BEEN~~ LABLED AS
USP AND NO TEST AT THE TIME WOULD HAVE*
Also during inspections, we have found insanitary *SHOWN
OTHERWISE*
conditions in physical plants where dietary ingredients *THE*
or dietary supplements were manufactured, packaged, or *PROPOSED*
held (Ref. 16). Pest infestation, building and *CGMPs WOULD
NOT HAVE
PREVENTED THE*
equipment defects, and leaking pipes that drip onto *EMS INCIDENT*
dietary supplements are examples of insanitary

*ADULTERATION ALREADY ILLEGAL —
JUST ENFORCE EXISTING LAWS —
BURDON OF PROOF IS ON FDA TO PROVE
ADULTERATION NOT ON MANUFACTURER
TO PROVE NOT ADULTERATED*

27

conditions that we have found that may lead to product adulteration and could cause consumer illnesses and injuries. The proposed rule would require a manufacturer, packager, or holder to maintain its physical plant used for these activities in a sanitary condition.

In the past, we have been involved in the recall of dietary supplements contaminated with lead (Ref. 17), salmonella (Ref. 18), Klebsiella pneumonia (Ref. 19), botulism (Ref. 20), and glass (Ref. 21). These contaminants can cause serious illness or injury and, in the case of lead, may result in chronic irreversible cognitive defects in children and progressive renal failure in adults. The proposed rule would require dietary ingredients and dietary supplements to be manufactured, packaged, and held in a manner that prevents adulteration, including adulteration by the contaminants such as those described.

We also have been involved in recalls for super- and subpotent dietary supplements. Recalls of superpotent dietary supplements have included the following dietary ingredients: Vitamin A (Ref. 22), vitamin D (Ref. 23), vitamin B6 (Ref. 24), and selenium (Ref. 25). Each of these dietary supplements contained dietary ingredient

*MISBRANDING ALREADY ILLEGAL — JUST ENFORCE EXISTING LAWS — BURDEN IS ON FDA TO PROVE MISBRANDING NOT ON MANUFACTURER TO PROVE PROPERLY BRANDED*

008595

*[handwritten: DID 28 THEY IN FACT CAUSE HARM?]*

levels that could have caused serious illness or

injury.  Illnesses or injuries such as nausea,

vomiting, liver damage, and heart attack were reported

from superpotent niacin at an average level of 452

milligrams (mg) niacin, well above the upper limit for

*[handwritten: 800 mg NIACIN / DAY IS GENERALLY SAFE — WITHOUT LIVER TESTS —]*

adults of 45 mg daily (Ref. 26).  Recalls for subpotent

dietary supplements have included a recall of folic

*[handwritten: FOR HEALTHY ADULTS]*

acid because the dietary supplement contained 34

*[handwritten: 45 mg PER DOSE]*

percent of the declared level (Ref. 27).  Such a

*[handwritten: MAY PRODUCE CUTANEOUS FLUSHING,]*

product would be misbranded under section 403 of the

*[handwritten: ITCHING AND BURNING]*

act (21 U.S.C. 343).  Folate plays a well-documented

*[handwritten: SENSATION BUT IS NOT HARMFUL]*

and important role in reducing the risk of neural tube

defects.  Neural tube birth defects, primarily spina

bifida and anencephaly, cause serious lifetime

debilitating injuries and disabilities, and even death.

Thus, use of subpotent folic acid by women who are or

may become pregnant may result in increased risk of

having a child with a neural tube defect.  The proposed

rule would require manufacturers to establish

specifications for the dietary supplement the

manufacturer makes and then meet those specifications.

Therefore, if the proposed rule is finalized, if the

label for a folic acid supplement declares that the

dietary supplement contains a certain level of folic

008596

acid, the folic acid supplement must actually contain

that level, or we would consider the folic acid

supplement to be adulterated under section 402(g) of

the act. *EXISTING LAW ON MISBRANDING ALREADY COVERS THIS*

- Other recalls have been necessary because of undeclared

  ingredients, including color additives (Refs. 28 and

  29), lactose (Ref. 30), and sulfites (Ref. 31).

  Undeclared ingredients, such as color additives,

  lactose, and sulfites, may cause potentially dangerous

  reactions in susceptible persons (Ref. 32).   The

  proposed rule would require manufacturers to verify

  that the correct labels have been applied to dietary

  ingredients and dietary supplements produced.   The

  master manufacturing record would have to identify each

  ingredient required to be declared on the ingredient

  list under section 403 of the act.   *ADULTERATION ALREADY ILLEGAL — JUST ENFORCE EXISTING LAW*

- A study found that dietary ingredient content varied

  considerably from the declared content (Ref. 33). The

  study examined ephedra alkaloids in 20 herbal dietary

  supplements containing ephedra (Ma Huang) to determine

  their ephedra alkaloid content.   This study found that

  norpseudoephedrine was often present in the ephedra

  dietary supplements.   The study also observed

  significant lot-to-lot variations in alkaloid content

*NORPSEUDOEPHEDRINE IS NATURALLY PRESENT IN EPHEDRA SINICA HERB*

*PSEUDOEPHEDRINE AND METHYLEPHEDRINE ARE NATURAL MINOR CONSTITUENTS OF EPHEDRA SINICA AND VARY FROM PLANT TO PLANT — WHICH IS WHY OUR MANUFACTURERS STANDARDIZE[30] FOR TOTAL EPHEDRINE ALKALOID*

for four products, including one product that had lot- *CONTENT IN EACH BATCH*

to-lot variations of ephedrine, pseudoephedrine, and

methylephedrine that exceeded 180 percent, 250 percent,

and 1,000 percent, respectively. Half of the products

tested differed in their label claims for ephedra

alkaloid content and their actual alkaloid content. In

some cases, the discrepancy exceeded 20 percent. One

*MIS BRANDING ALREADY ILLEGAL*

product did not have any ephedra alkaloids. Lot-to-lot

variation in dietary ingredients is a public health

problem particularly because conditions of use

recommended or suggested in the labeling of dietary

supplements are presumably based on the dietary

supplement containing a certain amount of the dietary

ingredient. If the dietary supplement contains more or

less than the amount that the manufacturer represents,

then the consumer does not receive the potential health

benefit from the dietary supplement or is exposed to an

amount that could present risk of injury or illness.

The proposed rule would require manufacturers to

establish controls, including master manufacturing and

batch production records to ensure that they use the

correct amount of the dietary ingredient to produce the

dietary supplement, and that they apply the correct

label to the dietary supplement.

31   *MINUTE AND NON-REPRESENTATIVE*

A private company analyzed a sample of dietary

supplements and found that some dietary supplements did

not contain the dietary ingredients claimed on the

label (Ref. 34).   The study found that 25 percent of

gingko biloba products, 20 percent of saw palmetto, 33

percent of glucosamine, chrondroitin and combined

*MISBRANDING*
*ALREADY*
*ILLEGAL*

glucosamine/chondroitrin, and 50 percent of SAMe did

not contain the dietary ingredients claimed in their

product labels.   The proposed rule would require

manufacturers to establish and meet specifications for

the identity, purity, quality, strength, and

composition of dietary supplements.   *FALSE! IT WOULD REQUIRE*
*PARTICULAR FDA APPROVED*

Given the wide range of public health concerns presented by *BUREAUCRATIC*
*METHODS TO*
the manufacturing, packaging, and holding practices for dietary *AVOID*
*MISBRANDING*
ingredients and dietary supplements, a comprehensive system of

controls is necessary to prevent adulteration and misbranding.

CGMPs are intended to establish such a comprehensive system.

Manufacturers who operate in accordance with CGMPs would be less

likely to distribute adulterated and misbranded dietary

ingredients or dietary supplements than those who do not meet the

requirements.   Quality assurance will maximize the probability

that unadulterated dietary supplements will reach the

marketplace.

*WHAT ABOUT DENAKO TRYPTOPHAN? OTHER THAN*

32

Establishing CGMP regulations for dietary supplements is only part of our broad science-based regulatory program for dietary supplements that is necessary to give consumers a high degree of confidence in the safety, composition, and labeling of dietary supplements. Aside from our CGMP efforts, we have taken other steps to protect the public health, such as:

- Reviewing claim notifications under section 403(r)(6) of the act to identify unlawful claims;

- Reviewing new dietary ingredient notifications to ensure that new dietary ingredients are reasonably expected to be safe under section 413 of the act (21 U.S.C. 350b);

- Evaluating the nutrition labeling of dietary supplements;

- Monitoring, through AERs voluntarily submitted to FDA, the occurrence of adverse events to identify potentially unsafe products; and

- Taking compliance actions against products that are adulterated or misbranded.

The CGMP regulation, if finalized, would, along with our other dietary ingredient and dietary supplement initiatives, contribute further to the protection of public health.

b. <u>CGMPs benefit consumers.</u> In addition to the public health benefits for consumers, CGMP regulations for dietary

THEY ALSO COST CONSUMERS FAR MORE THAN THEY ARE WORTH; SEE RUBIN'S ECONOMIC ANALYSIS

008600